OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 In our State justice system, the critical functions of investigating criminal activity and protecting citizens from unfounded accusations are performed by the Grand Jury, whose proceedings are conducted by the prosecutor alone, beyond public scrutiny. When the Grand Jury is subjected to improper influence and bias, its ability to discharge these essential functions fairly and reliably is necessarily undermined and the integrity of this constitutionally and historically independent institution impaired.
 

 In order to protect the liberty of all citizens, the Legislature requires that an indictment be dismissed where the Grand
 
 *402
 
 Jury proceeding is defective
 
 (see,
 
 CPL 210.20 [c]). Moreover, dismissal of the indictment is specifically compelled by statute when the integrity of the Grand Jury proceeding is impaired "and prejudice to the defendant may result” (CPL 210.35 [5]).
 

 The issue in this case is whether prosecutorial improprieties during presentation of defendant’s case to the Grand Jury rendered the resultant indictment fatally defective. Because the prosecutor’s misconduct was intentional, usurped the function of the Grand Jury and biased the proceedings against the defendant,, it impaired the integrity of the Grand Jury proceedings and created a substantial risk of prejudice to the defendant. We therefore reverse the order of the Appellate Division and dismiss the indictment, as mandated by CPL 210.35 (5), with leave to the District Attorney to seek resubmission of the charges to another Grand Jury.
 

 Facts
 

 On the evening of April 14, 1982, defendant’s wife, Mary Huston, and her mother, Allison Brown, were murdered in their home. Defendant and Mary Huston had been married, divorced and remarried. At the time of the murders, defendant was living at the home of his brother, Frank Huston.
 

 That evening, defendant accompanied the police to the station for questioning and provided them with a statement regarding his whereabouts. Defendant told the police that he had been served with divorce papers that day and went to his wife’s house in the late afternoon to discuss them with her, accompanied by a friend. Later, he made his evening walk past his wife’s house. The police searched the home of Frank Huston with defendant’s consent and also interviewed various family members. Nevertheless, they were unable to link defendant or anyone else to the crime, and no arrests were made.
 

 One and one-half years later, the police resumed their investigation, and Grand Jury proceedings against defendant commenced in November 1983. The first civilian witness called by the prosecutor to testify before the Grand Jury was Emma Threats. Threats was a friend of Vickie Pickles, who lived with defendant’s father, Jule Huston. Threats testified that Pickles came to her apartment at 5:00 a.m. on April 15, 1982, the day after the murders. Threats further testified that Pickles had a drink; Pickles told her that defendant had arrived at their apartment the previous evening, covered with blood and carrying a knife; and that Pickles informed her that defendant had
 
 *403
 
 stated to his father, "I told you I was going to do it and I did it.” According to Threats, Pickles also told her that defendant had left the knife at their apartment.
 

 The prosecutor informed the Grand Jury that Threats’ testimony constituted hearsay and that "[i]t is not evidence, that you can use at all against Joshua Samuel Huston.” But he then said:
 

 "I’m asking you now to perform the task of excluding that from your mind with respect to your ultimate deliberation regarding Joshua Samuel Huston. What we’re going to be doing is calling in Vickie Pickles. I’ll have the subpoena served upon her. She’ll be in probably two week[s] from today. At that time we’ll try and get the truth from her. If she’s cooperative and is willing to tell us the truth, then there’s no problem, you’ll just drop out and forget about the testimony entirely that you’ve heard from Emma Threats. If we have problems and if Vickie Pickles, whether it’s from fear or obstinacy, whatever, is not going to cooperate with us and disclose the truth to us, then I will be bringing up the other witness who has similar testimony as this from Georgia and seek a perjury indictment against Vickie Pickles from you. Okay. That’s the purpose of it. And that’s the admonition that I want the record to reflect.”
 

 Two weeks later, Pickles was called before the Grand Jury. She testified that defendant had visited his father earlier in the day on April 14, 1982. Defendant showed up again at 8:00 that evening, with a knife hidden in the sleeve of his blue jacket. Although there was blood on the tip of the knife and on defendant’s hand, she saw no blood on defendant’s clothing. According to Pickles, defendant told his father, "I think I killed them.” He did not leave the knife at their apartment but took it with him after Pickles refused to get rid of it.
 

 Pickles contended that her conversation with Threats the next day took place in the afternoon and in Threats’ van, not her apartment. She further maintained that, while she never informed the police of this incident, she related it to a friend named Charles Jones as well.
 

 The grand jurors themselves asked that defendant’s father be subpoenaed to testify, but the prosecutor expressed reluctance, responding that Jule Huston might be implicated in the
 
 *404
 
 commission or facilitation of the crime. Two weeks after Pickles’ testimony, however, Jule Huston testified before the Grand Jury. He maintained that defendant never returned to their apartment after his afternoon visit. According to Jule Huston, Pickles was an alcoholic who suffered from hallucinations.
 

 Notwithstanding Jule Huston’s repeated denials that defendant appeared at their apartment the evening of the murders displaying a knife, the prosecutor continued time and again to assume the existence of these repudiated facts during extended questioning of Huston. For instance, the prosecutor prefaced his questions to Huston with statements such as, "when [defendant] came over to your apartment that night” or "on that evening, when [defendant] displayed the knife.” Even after Huston had steadfastly maintained that he never saw defendant that evening and that defendant never made any statement to him about the murders, the prosecutor asked questions such as, "that night, Wednesday, April 14th, 1982, when [defendant] said that he thought that he had killed both of them, did you indicate to him to just throw the knife into the field?”
 

 During Huston’s testimony, the prosecutor ordered him to stop "running your mouth off without listening.” Huston was examined regarding the fact that, in the past, he had admitted himself to a psychiatric institution and pleaded guilty in a robbery case. He was also asked about his son’s prior drug addiction. Pickles, by contrast, was never questioned about her alleged drinking problem, even though several witnesses before the Grand Jury concurred that she was an alcoholic.
 

 The prosecutor also asked Huston about a laundry list of personal items belonging to Vickie Pickles that remained in Huston’s apartment although Pickles was no longer living there. The prosecutor informed the Grand Jury that he was issuing a subpoena to Huston requiring him to produce all of these items to the District Attorney’s office, who would forward them to Pickles. When Huston was subsequently recalled to the stand, the prosecutor berated him for not bringing these personal belongings with him.
 

 Testimony established that Allison Brown had been stabbed 12 times and Mary Huston 9 times, and the Grand Jury was shown photographs of the victims. The Grand Jury was also shown photographs of a pair of sneakers removed from the home of defendant’s brother and a green jacket that defendant was wearing when questioned by the police on April 14, 1982.
 
 *405
 
 Both items had human blood on them, in amounts insufficient to allow any grouping or typing.
 

 During the proceedings, several grand jurors noted that, according to Threats, Pickles had told her defendant was covered with blood. One grand juror thus commented that there "[s]hould have been more blood on his chest someplace,” and another observed, "[a]s a matter of fact, just looking at the number of wounds, punctures, he’d have to have more blood.” The prosecutor dismissed the grand jurors’ concerns, saying:
 

 "No, that’s not accurate. It’s not necessarily the case, even though you see a lot of blood, you also have to keep in mind that they had been lying there for a long time, so for a sufficient period of time, a lot of that blood would have come from bleeding onto the floor, so there’s nothing to indicate, we’ve got no evidence to indicate and it’s not accurate to assume that by the stab, the blood would splatter out and cover him, that kind of thing is not necessarily so.”
 

 A neighbor of Mary Huston further testified that she saw defendant and his wife arguing on the day of her death. She also observed defendant standing in the driveway outside his wife’s home between 7:00 and 7:30 that evening.
 

 The Grand Jury charged defendant with two counts of murder in the second degree. Defendant subsequently moved to dismiss the indictment due to prosecutorial misconduct before the Grand Jury. Although the trial court was "disturbed” by "the way the prosecutor seemed to testify before the Grand Jury,” it orally denied the motion. Defendant proceeded to trial and was convicted of both murder counts. The Appellate Division affirmed the convictions, concluding that defendant had failed to establish any possibility of prejudice resulting from the prosecutor’s misconduct. We now reverse.
 

 Analysis
 

 Our State Constitution guarantees that "[n]o person shall be held to answer for a capital or otherwise infamous crime * * * unless on indictment of a grand jury” (NY Const, art I, § 6;
 
 see also,
 
 CPL art 190). By acting as a "buffer between the State and its citizens,” the Grand Jury shields against prosecutorial excesses and protects individuals from unfounded prosecutions
 
 (People v Calbud, Inc.,
 
 49 NY2d 389, 394, 396;
 
 see, People v Pelchat,
 
 62 NY2d 97, 108). Historically, the Grand Jury has
 
 *406
 
 performed, the essential function of investigating criminal activity to determine whether sufficient evidence exists to accuse a citizen of a crime
 
 (see, People v Lancaster,
 
 69 NY2d 20, 26,
 
 cert denied
 
 480 US 922;
 
 People v Calbud, Inc.,
 
 49 NY2d at 394)
 

 The Criminal Procedure Law designates both the District Attorney and the court as legal advisors to the Grand Jury
 
 (see,
 
 CPL 190.25 [6]). Because Grand Jury proceedings are conducted by the prosecutor alone, this function confers upon the prosecutor broad powers and duties, as well as wide discretion in presenting the People’s case
 
 (see, People v Di Falco,
 
 44 NY2d 482, 487). In addition to providing legal instruction to the Grand Jury, the District Attorney determines what evidence to present to that body and what evidence should be excluded
 
 (see, id.,
 
 at 486-487).
 

 The prosecutor’s discretion during Grand Jury proceedings, however, is not absolute. As legal advisor to the Grand Jury, the prosecutor performs dual functions: that of public officer and that of advocate. The prosecutor is thus "charged with the duty not only to secure indictments but also to see that justice is done”
 
 (People v Lancaster,
 
 69 NY2d at 26,
 
 supra; see also, People v Pelchat,
 
 62 NY2d at 105,
 
 supra).
 
 With this potent authority, moreover, comes responsibility, including "the prosecutor’s duty of fair dealing”
 
 (People v Pelchat,
 
 62 NY2d at 104,
 
 supra).
 
 As this Court has explained, "[tjhese duties and powers, bestowed upon the District Attorney by law, vest that official with substantial control over the Grand Jury proceedings, requiring the exercise of completely impartial judgment and discretion”
 
 (People v Di Falco,
 
 44 NY2d at 487,
 
 supra).
 

 Where, as here, the charges facing the defendant are of the most serious nature, society’s interest in justice is especially great. Nevertheless, the prosecutor who submitted defendant’s case to the Grand Jury disregarded his role as public officer and his "duty of fair dealing.” The Grand Jury minutes are rife with instances of the prosecutor imparting his personal opinion regarding the proper inferences to draw from the testimony or physical evidence, asking impermissible and inflammatory questions, and conveying — both directly and indirectly — his belief in defendant’s guilt.
 

 An example of such misconduct was the prosecutor’s use of the concededly inadmissible hearsay testimony of Emma Threats, relating Vickie Pickles’ narration to her of defendant’s appearance with a bloody knife and his admission to the
 
 *407
 
 murders. Importantly, the prosecutor openly acknowledged that Threats’ testimony was not offered for any legitimate purpose. Rather, his articulated purpose for introducing Threats’ hearsay testimony before calling Pickles to the stand was to force Pickles to conform her account to the factual rendition already given by Threats and prevent any repudiation or modification.
 

 Such deliberate tactics to influence a witness’ Grand Jury testimony jeopardize "the goal of fostering free and truthful testimony”
 
 (People v Sayavong,
 
 83 NY2d 702, 708). We have, moreover, long condemned any Grand Jury practice that might incline a witness to give an inaccurate account of her knowledge of a crime
 
 (see, e.g., People v Minet,
 
 296 NY 315 [forbidding the presence of one witness during the Grand Jury testimony of another]).
 

 Even worse, the prosecutor proceeded to use Threats’ inadmissible testimony as a platform to convey to the Grand Jury his personal belief in defendant’s guilt. He repeatedly informed the Grand Jury that the version of events recounted by Threats was "the truth.” He further vouched for the reliability of Threats’ hearsay testimony by advising the Grand Jury that there was another witness in Georgia with "similar testimony.” The prosecutor thus became an unsworn witness against defendant, creating the danger that the Grand Jury, "impressed by the prestige of the office of the District Attorney, [would] accord great weight to [his] beliefs and opinions”
 
 (People v Paperno,
 
 54 NY2d 294, 301).
 

 The prosecutor’s comments usurped the function of the Grand Jury, which "remains the exclusive judge of the facts with respect to any matter before it”
 
 (People v Pelchat,
 
 62 NY2d at 105,
 
 supra; accord,
 
 CPL 190.25 [5]). The CPL provides that a Grand Jury may issue an indictment only where there is legally sufficient evidence
 
 and
 
 "competent and admissible evidence before it provides reasonable cause to believe that [a] person [has] committed [an] offense” (CPL 190.65 [1] [b]). "Reasonable cause” exists
 

 "when evidence or information
 
 which appears reliable
 
 discloses facts or circumstances which are collectively
 
 of such weight and persuasiveness
 
 as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it” (CPL 70.10 [emphasis added]).
 

 
 *408
 
 Reasonable cause "dictates the degree of certitude grand jurors must possess to indict” and, unlike legal sufficiency, is exclusively within the province of the Grand Jury
 
 (People v Jennings,
 
 69 NY2d 103, 115). Consequently, determination as to whether Pickles or Jule Huston was the more reliable witness and the weight to accord each witness’ testimony was to be made solely by the Grand Jury, uninfluenced by the opinion of the prosecutor
 
 (cf., People v Batashure,
 
 75 NY2d 306 [prosecutor may not inform the Grand Jury that, as a matter of law, he or she has determined that legally sufficient evidence has been presented]).
 

 Nor was this an isolated instance. To the contrary, the prosecutor’s exploitation of Threats’ inadmissible testimony was part of an over-all pattern of bias and misconduct. The prosecutor again acted as an unsworn witness, usurping the fact-finding function of the Grand Jury, when he informed it of the inference it should draw from the fact that only a small amount of human blood was found on defendant’s sneaker and jacket — the only physical evidence connecting defendant to the murders. Specifically, he informed questioning grand jurors that it was "not accurate” that, given the number of stab wounds, more blood should have been found on defendant’s clothing. He further stated, "we’ve got no evidence to indicate and it’s not accurate to assume that by the stab, the blood would splatter out and cover him.” Whether this physical evidence was sufficiently persuasive to warrant belief that defendant committed the crime, however, was a question reserved exclusively for the grand jurors.
 

 Throughout his questioning of Jule Huston, moreover, the prosecutor communicated his disbelief in Huston’s testimony to the Grand Jury. Although Jule Huston repeatedly denied that the bloody knife incident ever took place, the prosecutor continued to ask questions that assumed defendant did indeed appear at Huston’s apartment with a bloody knife and admit to killing his wife and mother-in-law. While a prosecutor who believes a witness is not being forthright may vigorously question or press that witness, the prosecutor here simply went too far.
 

 Manifestly, the prosecutor’s misconduct was pervasive. Under the CPL, however, the Grand Jury proceeding in a criminal action must be defective to warrant dismissal of the indictment
 
 (see,
 
 CPL 210.20 [1] [c]). We must therefore next determine whether the prosecutor’s behavior rendered the indictment fatally defective.
 

 
 *409
 
 CPL 210.35 (5) provides that a Grand Jury proceeding is defective when "the integrity thereof is impaired and prejudice to the defendant may result.” The exceptional remedy of dismissal is thus warranted only where a defect in the indictment created a possibility of prejudice
 
 (see, People v Di Falco,
 
 44 NY2d at 487,
 
 supra).
 
 Although this statutory test "is very precise and very high”
 
 (People v Darby,
 
 75 NY2d 449, 455), it does not require actual prejudice
 
 (see, People v Sayavong,
 
 83 NY2d at 709, 711,
 
 supra; People v Wilkins,
 
 68 NY2d 269, 276). Indeed, two earlier drafts of CPL 210.35 (5) required a showing of actual prejudice before an indictment could be dismissed as the result of defective Grand Jury proceedings. The Legislature, however, rejected a requirement of actual prejudice in favor of the current provision — requiring only that "prejudice to the defendant
 
 may
 
 result” (CPL 210.35 [5] [emphasis added];
 
 see, People v Di Falco,
 
 44 NY2d 482, 487,
 
 supra;
 
 Preiser, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A, CPL 210.35, at 676).
 

 Dismissal of indictments under CPL 210.35 (5) should thus be limited to those instances where prosecutorial wrongdoing, fraudulent conduct or errors potentially prejudice the ultimate decision reached by the Grand Jury. The likelihood of prejudice turns on the particular facts of each case, including the weight and nature of the admissible proof adduced to support the indictment and the degree of inappropriate prosecutorial influence or bias.
 

 Certainly, not every improper comment, elicitation of inadmissible testimony, impermissible question or mere mistake renders an indictment defective. Typically, the submission of some inadmissible evidence will be deemed fatal only when the remaining evidence is insufficient to sustain the indictment
 
 (see, People v Avant,
 
 33 NY2d 265, 271). Likewise, isolated instances of misconduct will not necessarily impair the integrity of the Grand Jury proceedings or lead to the possibility of prejudice.
 

 Here, however, the prosecutor did not simply introduce concededly inadmissible hearsay testimony — he did so with the stated goal of influencing upcoming testimony. The prosecutor then further thwarted the ability of the Grand Jury to uncover the facts accurately and conduct a reliable investigation by repeatedly conveying his personal assessment of critical witnesses and the physical evidence. As a result, the integrity of the Grand Jury proceedings was substantially undermined
 
 (see, People v Caracciola,
 
 78 NY2d 1021 [misleading legal
 
 *410
 
 instructions to the Grand Jury impaired the integrity of the proceedings and mandated dismissal of the indictment]).
 

 The risk of prejudice to defendant from the prosecutor’s impermissible tactics is manifest. The two crucial pieces of inculpatory evidence before the Grand Jury were the testimony of Vickie Pickles and the two items of defendant’s clothing containing small amounts of blood. Pickles’ version of events, however, was vigorously contested by Jule Huston. By informing the grand jurors that Vickie Pickles’ account was the truth, while undermining the credibility and character of Jule Huston, the prosecutor made it substantially more likely that the Grand Jury would believe Pickles.
 

 Likewise, defendant’s sneaker and jacket, while circumstantial evidence implicating his guilt, did not irrefutably lead to the conclusion that defendant committed the murders. Indeed, several grand jurors themselves questioned whether the small amount of blood found on these items could be reconciled with the number of stab wounds and amount of blood at the crime scene. The prosecutor’s assurances that these concerns were unfounded surely created at least the possibility of prejudice, since "the grand jurors and the prosecutor will not invariably see eye to eye about what the evidence establishes, particularly when more inchoate questions such as * * * inferences to be drawn from circumstantial evidence are critical”
 
 (People v Batashure,
 
 75 NY2d at 311,
 
 supra).
 

 In rarq cases such as this where irregularities in presenting the case to the Grand Jury rise to the level of impairing those proceedings and creating the risk of prejudice, "the indictment [can]not be permitted to stand even though it is supported by legally sufficient evidence”
 
 (People v Calbud, Inc.,
 
 49 NY2d at 395,
 
 supra).
 

 An important principle at the root of the statute compels this result: the Grand Jury acts as " 'the shield of innocence * * * and as the guard of the liberties of the people against the encroachments of unfounded accusations from any source’ ”
 
 (People v Minet,
 
 296 NY at 323,
 
 supra
 
 [citation omitted]). It is thus fundamental that the Grand Jury and those testifying before that body remain insulated from improper influence (see,
 
 People v Di Falco,
 
 44 NY2d at 488,
 
 supra
 
 ["(s)ecrecy is a vital requisite of Grand Jury proceedings”];
 
 see also,
 
 CPL 190.25 [4]). Where this tenet is flagrantly violated, society’s interest in the integrity of the criminal process itself is jeopardized.
 

 
 *411
 
 To countenance such conduct by a District Attorney that was overwhelmingly likely to influence the proceedings whenever legally sufficient evidence was otherwise adduced would overlook that the CPL requires not only legally sufficient evidence as a prerequisite to indictment but also reasonable cause to believe the person committed an offense. Given "the crucial nature of the prosecutor’s role . . . vis-á-vis the Grand Jury,” it would also significantly jeopardize the essential function of the Grand Jury to protect our citizenry
 
 (People v Di Falco, 44
 
 NY2d at 485,
 
 supra).
 
 The statutory remedy of dismissal thus not only protects the defendant but also safeguards the liberty of all citizens by ensuring that improper prosecutorial influence during secret Grand Jury proceedings will not lead to unfounded prosecutions.
 

 Likewise, conviction after trial does not cure defective Grand Jury proceedings (see,
 
 People v Wilkins,
 
 68 NY2d at 277, n 7,
 
 supra; see, e.g., People v Sayavong,
 
 83 NY2d at 702,
 
 supra
 
 [dismissing indictment of defendant convicted after jury trial, where impairment of Grand Jury proceeding potentially prejudiced defendant]). This is supported by the statutory scheme — while the Legislature has provided that claims of insufficiency of evidence to support the indictment are barred upon conviction after trial
 
 (see,
 
 CPL 210.30 [6]), no similar provision exists for claims of defect based upon impairment of the Grand Jury proceedings.
 
 *
 

 In sum, in this unusual case, the cumulative impact of the prosecutor’s improper tactics during presentation of defendant’s case to the Grand Jury sufficiently impaired the integrity of the proceedings as to warrant dismissal of the indictment. Because the CPL provides for reindictment of defendant, this remedy will allow another Grand Jury to pass upon defendant’s case after a presentation not tainted by bias and misconduct (see, CPL 210.20 [4]).
 

 In light of this determination, it is unnecessary to reach defendant’s remaining claim.
 

 Accordingly, the order of the Appellate Division should be reversed and the indictment dismissed with leave to the
 
 *412
 
 District Attorney to apply for an order permitting resubmission of the charges to another Grand Jury.
 

 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order reversed, etc.
 

 *
 

 We thus reject the People’s similar argument that defendant’s conviction after trial — where Pickles’ testimony again constituted the primary evidence against him — demonstrates that no possibility of prejudice arose from the prosecutor’s improper admission of Threats’ testimony before the Grand Jury, since no such error took place at trial. In any event, unlike the Grand Jury proceedings, Pickles’ trial testimony was not challenged by the contrary testimony of Jule Huston, since defendant’s father had previously died and his Grand Jury testimony was precluded at trial.