OPINION OF THE COURT
Joseph E. Fahey, J.
*671 The accused, Arabella Lucatuorto, is charged in a two-count indictment with the crimes of manslaughter in the first degree in violation of section 125.20 (1) of the Penal Law and criminal possession of a weapon in the fourth degree in violation of section 265.01 (2) of the Penal Law. She has moved to dismiss the indictment pursuant to CPL 190.30 (1) and 210.35 (5) upon the ground that she was unfairly prejudiced by the prosecutor’s questioning her about changing her account of what occurred when confronted with the prospect of a polygraph examination, relying upon People v Dobler (29 Misc 2d 481 [Suffolk County Ct 1961]). In support of this application, the accused cites a certain portion of the testimony during which the following occurred:
"Q: And didn’t you say to him, I’ll take a lie detector test?
"A: Yes.
"Q: Okay. And that’s how Detective Solan got involved, because you learned that he’s the guy that gives lie detector tests for the Sheriff’s Department?
"A: Yes.
"Q: And so you met with Detective Solan, and you ended up signing a second statement, is that right Mrs. Lucatuorto?
"A: Yes.” (Grand Jury transcript, at 162-163.)
"Q: Mrs. Lucatuorto, when Detective Solan was talking to you about the lie detector, do you recall him having a conversation with you about he didn’t want the machine to say that you were lying, if there was something you were lying about, tell him now before the machine says that?
"A: He was saying that to me, yes.
"Q: Okay at any point did you then say to him, the last 15 or 20 seconds about what happened to Richard, and you ended up telling him that it was you who stabbed him? Did you tell him that?
"A: I told him that my hand was on the knife when I pulled it out, but I didn’t recall any blackouts and I couldn’t even — I had lost my watch for two weeks, and I was — my back was against the closet in the kitchen, so I didn’t have a clue. The last time I had looked at a clock was when Richard sat down on the couch with me before 9:00, after he had finished talking to his sister, and that was the last time I looked at the clock.
"Q: So when Detective Solan asked you about lying and the machine’s telling him someone’s lying, you said to him your hand being on the knife when you were taking the knife out?
*672 "A: I just said I remember my hand being on the knife, and I was thinking it’s when I was pulling it out of his chest to put the cloth on the wound.” (Grand Jury transcript, at 168-169.)
In response, the People contend: "No evidence was presented to the Grand Jury that an actual polygraph test was completed. No evidence was presented to the Grand Jury indicating the results of a polygraph test. Hence, there was no inference to be drawn that the Defendant was lying then and therefore is lying now. Evidence was introduced that the defendant gave a second statement to Detective Solan. The mention of the lie detector test was merely to show the background of how Detective Solan became involved in the case. In fact, the question cited by the defendant 'And didn’t you say to him, I’ll take a lie detector test?’ Indicates that the defendant initiated the idea of the polygraph. The very next question was * * * 'and that’s how Detective Solan got involved’ * * * to which the defendant replied 'Yes.’ To dismiss an indictment based upon the mere mention of a polygraph test without mention of the results of the exam or whether one was ever taken, is unsupported by case law.” (People’s answering affidavit, point II ¶ 2.)
The law in New York is clear that polygraph examinations and their results remain inadmissible during both trial and Grand Jury proceedings. (People v Shedrick, 66 NY2d 1015 [1985]; People v Ricigliano, 138 AD2d 751 [2d Dept [1988].) The often-stated reason for their exclusion is that they are not considered competent or reliable. (Supra.) Indeed, such evidence has even been excluded in sentencing proceedings (People v Carmody, 213 AD2d 720 [2d Dept 1995]). Moreover, the Court of Appeals has most recently affirmed a trial court exclusion of expert psychiatric opinion testimony which was in some part predicated upon the results of a polygraph examination (People v Angelo, 88 NY2d 217 [1996]). It is thus clear that such evidence may not be received in direct or indirect form.
In the instant case, the People contend that the introduction of the testimony concerning a polygraph examination was "initiated” by the defendant herself and "to show the background of how Detective Solan became involved in the case” (People’s answering affidavit, op. cit). However, a review of the Grand Jury testimony of the accused reveals that she testified in the narrative for 28 pages without any mention of a polygraph by her. It was not until questioning by the prosecutor that the subject of a polygraph was introduced, cited by the prosector above. While these questions were prefatory to the introduction of the second statement taken by Detective Solan, which *673 arguably could be viewed as harmless if limited to providing background for the interview, the prosecutor sua sponte chose to return to the topic placing particular emphasis on the probable outcome of the test as viewed by Solan.
Moreover, this was neither the beginning nor the end of the topic before the Grand Jury. Following the accused, Detective Solan was called to testify about his interview with her. During the course of his testimony, Detective Solan told the Grand Jury about his training and experience as a polygraphist, and his discussion with the defendant about the polygraph itself, including the following:
"Q: After you completed the polygraph sensitivity test, tell us about your conversation with Mrs. Lucatuorto.
"A: I took a moment with Mrs. Lucatuorto to explain to her that I didn’t want the machine to call anyone a liar, and I tried to explain to her that it’s not a crystal ball, and it’s also not a 60/40 machine where part of what she said is true and another part is a lie. The polygraph doesn’t discern that, it just tells truth or deception. I asked her to make sure that what she told Det. Kruger [w]as 100 percent of the truth because I don’t want to call her a liar, and at that point she told me she hadn’t been a hundred percent truthful.
"Q: Would you tell us what she subsequently told you about what happened in that last 15 or 20 seconds?
"A: She stated that the part she had not been truthful about was the actual incident, which I believe to the case facts [sic] is the reason why her husband died. She stated she recalled her hands being on the knife inside her husband. She explained to me that the fight had gone into the kitchen area, she was in fear for her life, she was in a fetal position, she recalled that she didn’t remember where she got the knife from, whether she got it from a counter or the floor, but she remembered seeing her hand on the knife with her hand closer to the blade inside his chest cavity.
"Q: And after she told you this information, the fact that her hands were on the knife when it went into her husband, what did you do then?
"A: She had clearly — well, she had made it clear to me, in my opinion, that she stabbed her husband in fear of her life, or that was the impression I was getting, she didn’t know what was going to happen next, and therefore, I wanted to take a new affidavit from her, a more truthful affidavit, and I asked her if we could write out a second affidavit, and she was quite *674 willing to do that.” (Grand Jury transcript, at 186-187 [emphasis added].)
Detective Solan went on to testify about the mechanics surrounding the taking of the second statement, the contents which were read to the Grand Jury. Thereafter, the following occurred:
"Q: * * * Now, during the time that you were speaking to Mrs. Lucatuorto, did you at any time say to her that * * * prior to her telling you this about this last 15 or 20 seconds, did you say things to her that she may have blacked out, or she may have held the knife out? Did you suggest these things to her?
"A: Not at all.
"Q: How did that come about that she told you about this last 15 or 20 seconds?
"A: That was during the period that I asked her not to take the polygraph if she hadn’t been entirely truthful, and she said no, I don’t want to take the polygraph, because I haven’t been entirely truthful and she stated she may have blacked out, she suggested that. And she said I do recall my hand being on the knife closest to the handle.” (Grand Jury transcript, at 191-192 [emphasis added].)
Clearly, testimony about the proposed polygraph test involved more than "background” or context but was an integral part of the testimony concerning inculpatory statements made by the accused. Moreover, this testimony was taken with opinion testimony by Detective Solan, not only about what the defendant meant, but opinion testimony that the polygraph, if administered, would result in a finding she had lied. Given the heavy emphasis placed upon it during Detective Solan’s testimony, it is not surprising that the following occurred during his colloquy with the Grand Jury:
"Juror: I might have missed this entirely, but did she ever take a polygraph test?
"The witness: She told me she didn’t want to take it because she didn’t want it to call her a liar, no ma’am.
"Q: And she hasn’t taken one since?
"The witness: Not to my knowledge, no ma’am.” (Grand Jury transcript, at 195.)
It can hardly be gainsaid that Detective Solan communicated his opinion to the Grand Jury that the reason the accused did not take a polygraph test is because she lied. Such an opinion clearly runs afoul of the Court of Appeals holding in People v Angelo (88 NY2d 217, supra).
*675 In People v Hudson (88 NY2d 400 [1996]), the Court of Appeals held that where conduct before the Grand Jury creates a substantial risk of prejudice to the defendant, the indictment cannot be permitted to stand even where it is supported by legally sufficient evidence. Chief Judge Kaye, writing for a unanimous Bench, observed:
"In our State justice system, the critical functions of investigating criminal activity and protecting citizens from unfounded accusations are performed by the Grand Jury, whose proceedings are conducted by the prosecutor alone, beyond public scrutiny. When the Grand Jury is subjected to improper influence and bias, it’s ability to discharge these essential functions fairly and reliably is necessarily undermined and the integrity of this constitutionally and historically independent institution impaired.
"In order to protect the liberty of all citizens, the Legislature requires that an indictment be dismissed where the Grand Jury proceeding is defective (see, GPL 210.20 [c]). Moreover, dismissal of the indictment is specifically compelled by statute when the integrity of the Grand Jury proceeding is impaired 'and prejudice to the defendant may result’ (GPL 210.35 [5])” (88 NY2d, at 401-402).
In viewing the testimony before the Grand Jury, it is important to note that almost all of the evidence of the accused’s culpability came during her interrogation by the prosecutor and the testimony of Detective Solan. Since the testimony about the proposed polygraph and the defendant’s failure to take it was so intertwined with this, the substantial prejudice to her is manifest. Accordingly, the court is compelled to dismiss the indictment as mandated by CPL 210.35 (5) with leave to the People to seek resubmission of the charges to another Grand Jury.
Since re-presentment is being authorized to the People, some words of caution are warranted. Since a defendant possesses no due process rights to present favorable polygraph results to a Grand Jury (People v Ricigliano, 138 AD2d 751, supra), the People have no right to present unfavorable results. Indeed, any testimony about polygraphs or proposed polygraphs is fraught with peril as evidenced by what occurred in the instant case. Whatever testimony the People choose to present about interviews with the defendant or any questioning they choose to do of the defendant about interviews she had, should be thoroughly sanitized of any references to proposed polygraph tests and their possible consequences. It is readily apparent *676 that a proper foundation and presentation of the contents of interviews with the defendant can be undertaken without tapping into this subject matter.