*783 OPINION OF THE COURT
Joseph E. Fahey, J.
The defendant, Shirley Winters, is charged in this action with a single count of murder in the second degree in violation of section 125.25 (1) of the Penal Law. The indictment alleges that the defendant intentionally caused the death of her infant son Ronald Winters III on November 21, 1980 by smothering him. She was arraigned before the Honorable Anthony Aloi, a judge of this court, on March 28, 2007 and entered a plea of not guilty. On May 18, 2007, the defendant filed an omnibus motion pursuant to article 255 of the Criminal Procedure Law. Among the items of relief requested are that the court inspect the grand jury minutes pursuant to section 210.20 (1) (a) and section 210.25 of the Criminal Procedure Law. In support of this application, the defendant contends that the integrity of the proceedings was impaired because the prosecutor elicited testimony from the medical examiner, Dr. Mary Jumbelic, concerning the deaths of two of her other children and that this testimony was inadmissible, severely prejudicing her.[1]
The New York Court of Appeals in People v Di Falco (44 NY2d 482 [1978]) held that the standard for dismissal of an indictment under section 210.35 of the Criminal Procedure Law was only a showing of “possible] prejudice.” (44 NY2d 482, 487.) The Court reexamined this principle in People v Huston (88 NY2d 400 [1996]) in which Chief Judge Kaye observed:
“CPL 210.35 (5) provides that a Grand Jury proceeding is defective when ‘the integrity thereof is impaired and prejudice to the defendant may result.’ The exceptional remedy of dismissal is thus warranted only where a defect in the indictment created a possibility of prejudice (see, People v Di Falco, 44 NY2d at 487, supra). Although this statutory test ‘is very precise and very high’ (People v Darby, 75 NY2d 449, 455), it does not require actual prejudice (see, People v Sayavong, 83 NY2d at 709, 711, supra; People v Wilkins, 68 NY2d 269, 276). Indeed two earlier drafts of CPL 210.35 (5) required a showing of actual prejudice before an indictment could be dismissed as the result of defective Grand Jury proceedings. The Legislature, however, rejected a *784 requirement of actual prejudice in favor of the current provision — requiring only that ‘prejudice to the defendant may result’ (CPL 210. 35 [5] [emphasis added]; see People v Di Falco, 44 NY2d 482, 487, supra; Preiser, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A, CPL 210.35, at 676).” (Id. at 409.)
Chief Judge Kaye went on to caution:
“Dismissal of indictments under CPL 210.35 (5) should thus be limited to those instances where prosecutorial wrongdoing, fraudulent conduct or errors potentially prejudice the ultimate decision reached by the Grand Jury. The likelihood of prejudice turns on the particular facts of each case, including the weight and nature of the admissible proof adduced to support the indictment and the degree of inappropriate prosecutorial influence or bias.
“Certainly, not every improper comment, elicitation of inadmissible testimony, impermissible question or mere mistake renders an indictment defective. Typically, the submission of some inadmissible evidence will be deemed fatal only when the remaining evidence is insufficient to sustain the indictment (see, People v Avant, 33 NY2d 265, 271). Likewise, isolated instances of misconduct will not necessarily impair the integrity of the Grand Jury proceedings or lead to the possibility of prejudice.”(M.)
Turning to the proceeding in the instant case, as noted previously, the defendant was being investigated concerning her culpability for the death of her infant son on November 21, 1980 in the Town of Otisco. Various members of law enforcement and volunteer fire department personnel testified about responding to her residence on two occasions following her calls to 911 complaining that her child had stopped breathing. On each occasion the defendant was alone with the child. On the first occasion, emergency treatment in the form of CPR was administered and the child was transported to the hospital where he was treated and discharged after several days. On the second occasion, the child was unresponsive, and despite emergency CPR, was pronounced dead at the hospital. The cause of death was attributed to sudden infant death syndrome.
In addition to these witnesses, the defendant’s ex-husband and victim’s father testified. During his testimony about the *785 death of Ronald Winters III, he was questioned extensively about a fire which consumed their home in Jefferson County in September 1979. At that time, he testified, the defendant was alone with two of their children and those two children died in the fire (grand jury transcript at 58-64). Following testimony from an evidence technician from the Onondaga County Sheriffs’ Department, the medical examiner was called. During the course of her testimony, she recounted her own reautopsy examination of the victim after he and his siblings were exhumed pursuant to an order of this court. She disputed the original finding that the cause of death was sudden infant death syndrome and opined that the infant had been suffocated. In the course of giving this opinion, she was asked further:
“Q. Now, is that opinion that you’ve rendered, is that any — is that independent of any consideration regarding the death of Colleen Winters and John Winters?
“A. Yes.
“Q. You did also re-autopsy Colleen Winters and John Winters?
“A. Yes.
“Q. And did you also review medical records pertaining to their autopsies back in 1979?
“A. Yes.
“Q. And what was listed or what was determined to be the cause of death back in ‘79?
“A. I don’t have the exact wording in front of me, but it was smoke inhalation due to the fire.
“Q. Now, as a result of your re-autopsy of these two children, do you agree with that conclusion?
“A. No.
“Q. Do you have an opinion as to the — within a reasonable degree of medical certainty as to the cause of death of Colleen and John Winters?
“A. Yes.
“Q. Tell the Grand Jury what that opinion is.
“A. Well, as far as Colleen goes, her cause of death is blunt head trauma occurring before the fire. And for John, his cause of death is the smoke inhalation due to the fire, but convoluted by significant blunt head trauma that occurred before the fire.
“Q. Do these findings in any way impact on your conclusion regarding the cause of death of Ron
*786 Winters the Third?
“A. I think they corroborate and verify it.” (Grand jury transcript at 107-108.)
Notwithstanding her claim that her opinion regarding the death of the victim was rendered “independent” of the consideration regarding the deaths of the other two siblings, the grand jurors were clearly being told that those two deaths were factors to be considered in reaching their determination that the death of the victim was a homicide.
At the outset of the proceedings, the prosecutor had instructed the grand jurors that:
“Also, another thing that might be a little out of the ordinary: If you do hear evidence — we’re talking about a case that occurred in Onondaga County. If you do hear during the course of this presentation evidence of any other crimes allegedly that may have been committed, if they are admitted into evidence by myself or Ms. Thomson, who will be presenting the case with me, they’re solely designed to eliminate or to avoid the suggestion that the death of this baby may have been a mistake or an accident or something other, something other than a homicide.
“Let me see if I can explain this a little bit better. If I’m presenting a burglary case to you, and it involves a burglary of a residence, you know, 123 Main Street, I would normally not present evidence to you that the individual defendant had committed three other burglaries or 20 other burglaries, because that would be prejudicial to him, and the prejudicial value of that would outweigh its probativeness. And you might be inclined to say, you know, this is really a bad case, but I’m going to indict him anyways because he’s had a number of burglaries. There are some kinds of crimes where the modus operandi, or the manner of death, is so unusual or — and so unique, that evidence of other crimes may be committed to consider. And I’ll charge you on the law either late this morning or early this afternoon. Anybody have anybody have questions?” (Grand juiy transcript at 2-4.)
At the conclusion of the evidence, they were further instructed:
“I’d also charge you that there are occasions in ap *787 propriate circumstances when in this case the Grand Jury can hear and consider the introduction of evidence of uncharged crimes to prove, among other things, and not in this case, to prove but to create a reasonable possibility, among other things, the defendant’s identity as the perpetrator, her motive for committing the crime, her intent while doing so, her guilt, knowledge, or that the crime under consideration here, the death of Ron Winters the Third, was not the product of an accident or mistake. “There is evidence in this case that on another occasion the defendant may have caused the death of her children Colleen or John. That evidence was not offered — as I’ve told you initially, that must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crime charged in this case. It was offered as evidence for your consideration on the question of identity, question of intent, on the question of absence of mistake or accident. If you find the evidence believable, you may consider it for that limited purpose and for none other. Anybody have any questions on the law? Okay. We’ll wait for your decision.” (Grand jury transcript at 141-142 [emphasis added].)
Putting aside the obvious prejudice that inured from the grand jurors being instructed that they could consider evidence of other crimes on the question of “her guilt,” it is apparent from a full reading of the proceedings that the evidence of the homicides of the other two children was being offered to rebut illusory issues. All of the witnesses who testified concerning the two calls to the defendant’s residence, that preceded and culminated in the victim’s death, testified that the defendant was alone with the victim. Thus, there was no factual issue being presented which suggested that some other individual was responsible for the death. Likewise, the manner in which the deaths of the first two siblings were caused, i.e., blunt head trauma and smoke inhalation from the house fire, and the opinion that the victim in the indictment was suffocated, presents no similarity in modus operand! which would illuminate the issue of whether the defendant was responsible for both occurrences. Similarly, no testimony was presented raising the issue that the defendant caused the death of the victim either negligently, recklessly, mistakenly or accidentally. Moreover, the *788 medical examiner’s testimony that the deaths of the other two siblings in the fire “corroborate and verify” that the victim’s death was a homicide clearly demonstrates that the evidence served no other purpose than to prove the defendant’s propensity and predisposition to murder her children, the prosecutor’s limiting instruction notwithstanding.
In response to the defendant’s motion to dismiss, the People rely upon People v McCreary (186 AD2d 1070 [1992]). In that case, the Fourth Department affirmed a defendant’s conviction despite the grand jury being informed of improper Molineux evidence. That Court, however, noted that its affirmance was due to the “unique circumstances of this case,” citing a positive fingerprint comparison at the site of a burglary (at 1071). No such circumstance is presented here. The medical examiner was testifying about her conclusions concerning a reautopsy done 27 years after the victim’s death. She described the body as being in “bad condition for having been waterlogged for all these years.” (Grand jury transcript at 106.) The hospital records at the time of the infant’s death revealed that there “were at least five episodes of apnea, which means loss of breathing, that didn’t require medical intervention . . . and two episodes of nose bleeds.” (Grand jury transcript at 100.) She further noted that a sibling had also experienced “an episode of apnea as well.” (Grand jury transcript at 100.) Despite this apparent history, she focused on the evidence “inside of the lungs of [the victim] having choked on some stomach contents” prior to death, “during an episode of apnea” which she concluded was an “attempted suffocation.” (Grand jury transcript at 100-101.) As noted above, she went on to conclude that the infant’s death was caused by suffocation and the deaths of the other two siblings were “corroborative” of that conclusion. In the court’s view, if the consideration of the other two siblings’ deaths were excised from the testimony, the medical and scientific evidence concerning the death of Ronald Winters III would, at best, be muddled and confusing.
The People, to their credit, did attempt to give limiting instructions concerning the grand jury’s consideration of the Molineux evidence, as discussed above. Thus, the court believes that the introduction of the evidence before the grand jury was a good faith, albeit erroneous, application of Molineux but one which is fatal to the indictment.
Applying the standards articulated by Chief Judge Kaye in People v Huston (88 NY2d at 409) to the particular facts of this *789 case, the court believes that given the paucity of medical and scientific evidence concerning the cause of death of the victim, the prejudice of this testimony vastly outweighed its probative value so as to have impaired the integrity of the grand jury proceeding requiring dismissal of the indictment.
The defendant additionally has asked the court to examine the minutes to determine whether the prosecution failed to present exculpatory evidence to the grand jury, in particular
“that medical opinions as to the cause and manner of death rendered by Dr. Eugene Kagan, M.D., a Pathologist at Crouse Irving Memorial Hospital and the death certificate signed by Dr. Fredrick Ho, M.D. the attending physician in 1980 are contrary to the opinion Dr. Jumbelic offered at the Grand Jury.” (Defense counsel’s affirmation at 3, ¶ E.)
In support of this request, he relies upon United States v Williams (504 US 36 [1992]), People v Valles (62 NY2d 36 [1984]), and People v Lancaster (69 NY2d 20 [1986]). A review of these decisions, however, reveals that the defendant’s reliance on them is misplaced.
In United States v Williams, Justice Scalia expressly held that
“[imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system. If a ‘balanced’ assessment of the entire matter is the objective, surely the first thing to be done — rather than requiring the prosecutor to say what he knows in defense of the target of the investigation — is to entitle the target to tender his own defense. To require the former while denying (as we do) the latter would be quite absurd. It would also be quite pointless, since it would merely invite the target to circumnavigate the system by delivering his exculpatory evidence to the prosecutor, whereupon it would have to be passed on to the grand jury — unless the prosecutor is willing to take the chance that a court will not deem the evidence important enough to qualify for mandatory disclosure.” (504 US 36, 52 [1992].)
Likewise, Valles stands, not for the proposition that exculpatory evidence must be presented to the grand jury, but rather requires a prosecutor to instruct the grand jury on the existence of a complete defense where the facts before the grand jury dis *790 close the existence of one. Lancaster[2] is a limitation on Valles in that the prosecutor is not required to present evidence involving the existence of a mental disease or defect defense, nor charge the same, even where the facts disclose it, because of the extensive ensuing commitment proceedings which are then required.
In the instant case, the opinions of Dr. Kagan and Dr. Ho are merely contrary opinions to Dr. Jumbelic, to be accepted or rejected, and fall far short of a complete defense as Valles and Lancaster require. Moreover, the grand jury was made aware of the existence of the contrary findings during the testimony of Dr. Jumbelic when she was expressing her disagreement with them. While this may be an imperfect presentation of those opinions from the defendant’s standpoint, nothing more appears to be required.
For all of the foregoing reasons, the indictment in the within action is dismissed with leave for the People to present evidence to a new grand jury in accordance with the court’s opinion.

. This request was apparently triggered by the People having provided the defendant with a transcript of Dr. Jumbelic’s testimony in lieu of a report of the reautopsy.

. The writer was counsel for the defendant in Lancaster.