[8 NE3d 803, 985 NYS2d 428]

The People of the State of New York, Respondent, v Paul Thompson, Appellant.

Argued January 7, 2014; decided February 20, 2014

## POINTS OF COUNSEL

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Warren S. Landau* of counsel), for appellant. I. The prosecutor impaired the grand jury's integrity and denied appellant due process

when she (a) dissuaded the grand jurors from honoring appellant's request that they call an eyewitness who had exculpatory information by, inter alia, repeatedly telling them that they "ha[d] to take [her] advice" that the witness was irrelevant; and (b) accused appellant of orchestrating a stabbing from his hospital bed and persistently conveyed her disbelief of his testimony. (*People v Huston*, 88 NY2d 400; *People v Lancaster*, 69 NY2d 20; *People v Bailey*, 58 NY2d 272; *People v Pelchat*, 62 NY2d 97; *People v Hill*, 5 NY3d 772; *People v Paperno*, 54 NY2d 294; *People v Di Falco*, 44 NY2d 482; *People v Adessa*, 89 NY2d 677; *People v Sandoval*, 34 NY2d 371; *People v Molineux*, 168 NY 264.) II. The court denied appellant his right to a public trial when it excluded his friend and business partner, Shawn Berry, from the courtroom during much of the defense case solely because the People asserted that they might call him as a rebuttal witness, when the court had ruled that their plea agreement with Berry precluded them from doing so. (*Waller v Georgia*, 467 US 39; *People v Tolentino*, 90 NY2d 867; *People v Jones*, 47 NY2d 409; *People v Alvarez*, 20 NY3d 75; *People v Martin*, 16 NY3d 607; *People v Jelke*, 308 NY 56; *People v Hinton*, 31 NY2d 71; *In re Oliver*, 333 US 257; *Matter of Gannett Co. v De Pasquale*, 43 NY2d 370, 443 US 368; *Presley v Georgia*, 558 US 209.) III. The court improperly altered the prescribed order of trial and denied appellant due process and an effective suppression remedy, when, in response to an appropriate defense summation argument, it allowed the People to reopen their case to introduce suppressed evidence. (*Mapp v Ohio*, 367 US 643; *People v Olsen*, 34 NY2d 349; *People v Fardan*, 82 NY2d 638; *People v Melendez*, 55 NY2d 445; *People v Massie*, 2 NY3d 179; *People v Reid*, 19 NY3d 382; *People v Whipple*, 97 NY2d 1; *People v Ventura*, 35 NY2d 654; *People v Fama*, 212 AD2d 542; *People v Carrion*, 54 AD3d 640.) IV. Appellant was denied his due process rights to present a defense and a fair trial by the court's (a) refusal to admit a police surveillance video of the shooting scene, which the People had stipulated into evidence at the first trial, and preclusion of defense argument that an adverse inference should be drawn from the People's failure to offer it; (b) preclusion of evidence and argument as to a key defense witness's credibility; and (c) exclusion of appellant's hospital record, which would have supported his testimony that he could not have done what the People claimed the shooter did. (*People v McGee*, 49 NY2d 48; *People v Hawkins*, 11 NY3d 484; *People v Ely*, 68 NY2d 520; *People v Patterson*, 93 NY2d 80; *Zegarelli v Hughes*, 3 NY3d 64; *People v Williams*, 55 AD3d 1398; *People v*

*Byrnes*, 33 NY2d 343; *People v Lee*, 80 AD3d 1072; *People v White*, 73 NY2d 468; *People v Walker*, 198 NY 329; *Clason v Baldwin*, 152 NY 204.) V. Appellant was denied the effective assistance of counsel when his attorney failed to (a) request meaningful relief for the People's refusal to disclose contact information for an exculpatory witness; (b) protect appellant from the People's efforts to portray him as a violent menace and witness intimidator; and (c) otherwise avoid prejudicing the defense. (*Strickland v Washington*, 466 US 668; *People v Baldi*, 54 NY2d 137; *People v Zaborski*, 59 NY2d 863; *People v Droz*, 39 NY2d 457; *Kimmelman v Morrison*, 477 US 365; *People v LaBree*, 34 NY2d 257; *People v Bennett*, 29 NY2d 462; *People v Dean*, 50 AD3d 1052; *Quartararo v Fogg*, 679 F Supp 212, 849 F2d 1467; *Brady v Maryland*, 373 US 83.)

*Daniel M. Donovan, Jr., District Attorney*, Staten Island (*Anne Grady* and *Morrie I. Kleinbart* of counsel), for respondent. I. The evidence of defendant's guilt was overwhelming. (*People v Calabria*, 3 NY3d 80; *People v Arroyo*, 54 NY2d 567.) II. The prosecutor's conduct in the grand jury served to protect the integrity of that body's function. (*People v Brewster*, 63 NY2d 419; *People v Lancaster*, 69 NY2d 20; *People v Mitchell*, 82 NY2d 509; *People v Adessa*, 89 NY2d 677; *People v Smith*, 84 NY2d 998; *People v Karp*, 76 NY2d 1006; *People v Di Falco*, 44 NY2d 482; *People v Huston*, 88 NY2d 400; *People v Darby*, 75 NY2d 449; *People v Germosen*, 86 NY2d 822.) III. The exclusion of Shawn Berry from defendant's trial comported with the relevant constitutional standards. (*Waller v Georgia*, 467 US 39; *Perry v Leeke*, 488 US 272; *People v Cooke*, 292 NY 185; *Geders v United States*, 425 US 80; *People v Sayavong*, 83 NY2d 702; *People v Santana*, 80 NY2d 92; *People v Hinton*, 31 NY2d 71; *People v Baker*, 14 NY3d 266; *People v Porter*, 9 NY3d 966; *People v Garcia*, 20 NY3d 317.) IV. The court acted within its discretion by permitting the People to reopen their case to introduce a suppressed glove following defense counsel's misleading summation comments. (*United States v Verdugo-Urquidez*, 494 US 259; *Kansas v Ventris*, 556 US 586; *Withrow v Williams*, 507 US 680; *Stone v Powell*, 428 US 465; *In re Gault*, 387 US 1; *Walder v United States*, 347 US 62; *Harris v New York*, 401 US 222; *Oregon v Hass*, 420 US 714; *James v Illinois*, 493 US 307; *People v Brown*, 98 NY2d 226.) V. Defendant's due process rights to present a defense and to a fair trial were fully vindicated. (*People v Alvarez*, 20 NY3d 75; *People v Angelo*, 88 NY2d 217; *People v Umali*, 10 NY3d 417; *People v Aska*, 91 NY2d 979; *People v Jackson*, 8 NY3d 869; *People v Davidson*, 98 NY2d 738; *People v*

*Hines,* 97 NY2d 56; *Holmes v South Carolina,* 547 US 319; *Crane v Kentucky,* 476 US 683; *Chambers v Mississippi,* 410 US 284.) VI. Defendant received meaningful representation from trial counsel. (*People v Benevento,* 91 NY2d 708; *People v Flores,* 84 NY2d 184; *People v Baldi,* 54 NY2d 137; *People v Reyes,* 287 AD2d 660; *People v Nowicki,* 49 AD3d 666; *People v Dolan,* 2 AD3d 745; *People v Groonell,* 256 AD2d 356; *People v Turner,* 5 NY3d 476; *Strickland v Washington,* 466 US 668; *People v Hobot,* 84 NY2d 1021.)

## OPINION OF THE COURT

ABDUS-SALAAM, J.

Defendant vigorously urged the second grand jury in this case to have the People call a particular witness to testify. After the two prosecutors presenting the case noted the vagaries of defendant's request and asserted that the witness's testimony would be irrelevant, the grand jurors voted on defendant's request in accordance with CPL 190.50 (6) and declined to hear from the witness. Subsequently, the grand jury voted for an indictment supported by legally sufficient evidence establishing reasonable cause to believe that defendant had publicly executed a rival drug dealer on a street corner in Staten Island. Defendant was then tried and convicted of second-degree murder by a jury of his peers.

Defendant now seeks reversal of his conviction and dismissal of the indictment on grounds of prosecutorial misconduct, insisting that the prosecutors' commentary on his proffer to the second grand jury effectively compelled the grand jury to surrender all independent discretion in the matter and thus impaired the integrity of the proceedings. Of course, we are highly concerned about prosecutorial overreach in the grand jury context, and the prosecutors here should have shown greater sensitivity to defendant's request and the grand jurors' concerns. However, in light of the totality of the circumstances that arose in the second grand jury proceeding, we conclude that the prosecutors' actions did not impair the integrity of that proceeding or otherwise warrant dismissal of the indictment.

## I

After defendant's arrest on suspicion of murdering Rasheem Williams in the Stapleton neighborhood of Staten Island, the People presented weapon possession charges against him to a grand jury. The People planned to call a witness (hereinafter

Jane Doe) to testify in the grand jury proceeding that she had seen defendant shoot Williams. However, prior to the grand jury presentation, Jane Doe received anonymous threats. When she subsequently testified, Jane Doe gave a description of the shooter somewhat consistent with defendant, but she told the grand jurors that she had not seen the shooter's face. As Jane Doe would later inform the People, she was too scared to identify the shooter to the first grand jury. The People also presented the testimony of an eyewitness (hereinafter John Doe) who knew Williams. Defendant testified on his own behalf. The grand jury declined to indict defendant on the weapon possession charges.

Subsequent to the first grand jury proceeding, another Stapleton resident (hereinafter James Doe) was detained by the police in an unrelated case. James Doe informed the police that he had seen defendant, who was accompanied by someone resembling defendant's friend Shawn Berry, shoot Williams to death. Upon learning this information, the People filed weapon possession and murder charges against defendant and Berry, and with the court's permission, they submitted the new charges to a second grand jury, proceeding on the theory that defendant had killed Williams in retaliation for Williams's alleged prior shooting of defendant.

At the second grand jury presentation, the People, represented by two assistant district attorneys, called James Doe to the stand. James Doe testified that he had seen defendant, as well as a man whose appearance was consistent with Berry's and a third man with light skin, lying in wait for Williams in a car. Defendant and the light-skinned man got out of the car, and defendant shot Williams in the head and then fled with the light-skinned man.

Williams's friend, John Doe, testified that, on the morning of the murder, he was near the corner where Williams was gunned down, and he heard a scream. John Doe saw a light-skinned black or Hispanic man running in his direction but on the opposite side of the street. The man wore a black hoodie, black "cotton fall gloves," dark pants and dark blue or black short-cut Timberland boots. The man was holding a white shirt with a three-inch gun barrel sticking out of it. John Doe saw part of the man's face, which had "blotchy" light and dark skin indicative of vitiligo. The man ran toward the location where defendant was later arrested. Returning his attention to the corner, John Doe noticed that his friend, who had the same first name as Jane Doe, was there.

Berry testified that he had been moving out of his old residence at the time of the crime, and he requested that the grand jurors call two witnesses to corroborate his alibi. The grand jurors did not immediately respond to his request, and they asked him some follow-up questions.

Defendant testified and maintained his innocence. According to defendant, he had been merely running an errand near the scene of Williams's murder when the police arrested him. The grand jury actively questioned defendant about his relationship with Berry, the details of his errand, his interactions with the police and the description of the shooter that the police had provided to him. The grand jurors also inquired as to whether defendant had blotchy skin at the time of the murder.

After the grand jurors' questioning, defendant was excused, but he soon returned to the grand jury room to make an additional statement. Defendant told the grand jury that there was a missing female eyewitness to the shooting. The lead prosecutor asked defendant how he knew of the witness in light of his denial that he had been at the scene of the crime when it occurred. Defendant started to answer, but the prosecutor cut off his explanation on a hearsay objection. Defendant complained:

> "The District Attorney will not let me talk about a witness. I have her name and, you, the Grand Jury, have the permission to call this girl. They have her name and address. She was brought here to the last Grand Jury. She did not testify—or I don't know if she didn't testify, but this person is a witness to this crime."

The prosecutor asked defendant how he knew that, and defendant said, "She was brought—they told me there was a witness to the crime." When the prosecutor inquired as to the relevance of the witness's testimony, defendant answered, "Because if you, the District Attorney know there's a witness that witnessed this crime and the witness is not—is saying it's not me—." The following discussion ensued:

> "[Prosecutor]: Do you know that she testified to that Mr. Thompson, because I have to instruct this Grand Jury if you are speculating as to whether or not she testified that somebody else did the crime, that is not relevant for their consideration.
>
> "[Defendant]: She was brought here to testify. Like

I said before, the only charge I was charged with was the guns. She was brought here to testify.

"[Prosecutor]: Do you know what her name is?

"[Defendant: first name resembling Jane Doe's first name and different last name]. They have her address and they know this information pertaining to this crime. I'm asking you, please, you have the power to call this young lady . . . Her name is [first name resembling Jane Doe's first name] or [Jane Doe] or [another last name]. The District Attorney has her address. . . . For some reason, I don't know the reason—it's not clear to me if this person testified in the first Grand Jury. I am saying she was brought here. I don't know if she came to testify."

The prosecutor asked defendant whether he had spoken to the witness and had learned about her testimony in the grand jury, and defendant said, "You would know—." The prosecutor interjected, "I wouldn't know, because I don't have any idea who you're talking about." In response to further queries about the witness, defendant said that he was not sure whether the witness's last name was Jane Doe's last name or the other last name he had mentioned, but he knew her first name was the same as Jane Doe's first name. Defendant acknowledged that he had never spoken to her and had no idea what she would say. Defendant also claimed that the detectives at the police precinct had told him about the missing witness to the crime, "[Jane Doe] or [Jane Doe's first name with the other last name]." Defendant again told the grand jurors that they had the power to compel the appearance of "Mrs. [Jane Doe's last name] or [the other last name]," and that "[s]he will tell you I'm not the shooter, as I told you." Defendant was then excused for the second and final time.

Noting that John Doe had also mentioned someone with the same first name as Jane Doe, a grand juror asked if the grand jury could hear her testimony. The prosecutor "instruct[ed] [the grand jurors] that it is not relevant at this time based on the evaluation of the evidence and witnesses." When the grand juror professed not to understand this, the prosecutor repeated that the proposed evidence was not relevant, and she stated, "It's in our purview to decide that." The grand juror retorted, "[i]t doesn't make sense."

A grand juror asked, "Can we vote as to having that witness come in?" This exchange then occurred:

> "[Lead Prosecutor]: Let me explain it this way, based on our investigation and what's been testified to, and I'm skating a thin line here, I think at this point, it's six-thirty, we have to make a lot of determinations right now. Additionally, based upon on our investigation, *and it's up to you whether to have that witness*, but I'm telling you that it is not relevant to this proceeding. You have to take our advice, as your legal advisors, that it is not relevant to the situation at hand.
>
> "[Grand Juror]: How?
>
> "[Second Prosecutor]: However, *it would be relevant, if she was going to give testimony in the defendant's favor*. It's our determination, she is not relevant. Any other questions?" (emphasis added).

As the grand jury continued to question her, the lead prosecutor admitted that she knew the nature of the witness's potential testimony "[b]ased upon [the People's] investigation and interviews of her." The prosecutor further stated:

> "And, again, I'm sure you were told repeatedly, every time somebody charges you, it is not everybody in society that was on the face of the planet that day coming before the Grand Jury. Just because he offers it—he talked about newspaper articles, what police officers told him. That is not legal evidence to come before you. Hold on one second. *What I am going to do is let you put it to a vote. If twelve or more jurors, who were present and heard all the evidence on the dates we were in session, vote as to whether or not you want to hear from,* I believe the name of the person, we are not even clear on the names here, if it is even the same individual, he says *[Jane Doe's first name]* or *[a first name resembling Jane Doe's first name and Jane Doe's last name] or [another last name], that is the person he is saying, if that's what you want to do, you need twelve or more people to vote on that*" (emphasis added).

When a grand juror interrupted, the prosecutor again told the grand jurors that "[t]he witness will be subpoenaed if twelve or more of [them] vote[d] on this," but that "[a]t this point [they] need[ed] to first decide if [they] believe[d]—that [they] th[ought] that's relevant to proving as to whether or not this defendant,

who just testified, committed the crimes." The prosecutor continued:

> "One more thing you should keep in mind, I am going to refresh your recollection, marshal the evidence in regards to, you have an eyewitness who identified the defendant at the scene as the shooter. Keep that in mind. If this additional person is relevant at this point, and you have no idea, and he didn't offer any evidence to you either if she was there or not there, if she is even able to identify anybody—Keep that in mind. If *you* think that's really relevant, whether or not *you* want to hear from this person—you have an eyewitness, you have additional evidence in the case. Again, it's not a trial" (emphasis added).

The grand jurors voted on defendant's request for the witness's testimony and rejected it. Thereafter, the grand jury indicted defendant on various charges, including second-degree murder, second-degree weapon possession and third-degree weapon possession.

After their vote to indict defendant, the grand jury voted on and approved Shawn Berry's previous request to hear from two witnesses. The witnesses then appeared before the grand jury. The grand jurors indicted Berry as well.

Defendant made two unsuccessful motions to dismiss the indictment. In support of the second one, defendant argued that the prosecutors had committed misconduct in criticizing defendant's entreaties to have the grand jury call Jane Doe to the stand. Among other things, defendant analogized Jane Doe's testimony to *Brady* material, suggesting that just as "fear for [a] witness's safety did not insulate the People from Brady violation [sic]," it could not justify the refusal to allow the witness to appear here. Defendant further sought to inspect the minutes of the first grand jury proceeding.

The People opposed defendant's renewed dismissal motion. In addition to challenging the sufficiency of defendant's offer of proof and relying on their role as legal advisors to the grand jury, the People asserted that whether Jane Doe had testified before the first grand jury was irrelevant to defendant's claim. The People also maintained that defendant's request to inspect the first grand jury minutes to review Jane Doe's testimony was "an effort to circumvent the secrecy of the Grand Jury and find out who testified, not for any legitimate purpose."

After these arguments, Supreme Court denied defendant's renewed motion to dismiss the indictment. Thereafter, the People successfully obtained a protective order for Jane Doe, citing, among other things, the threats that had caused her to testify in the first grand jury proceeding inconsistently with her prior statements to the People.

## II

CPL article 190 governs the conduct of the grand jury and the parties which appear before that body, and it requires that all grand jury proceedings remain secret to protect the essential functions of those various actors (*see generally* CPL 190.05, 190.25 [4] [a]). Under this statutory regime, the exclusive "legal advisors of the grand jury are the court and the district attorney" (CPL 190.25 [6]), and their decision to present certain items of evidence and to exclude others is for the most part limited only by the rules of evidence applicable at trial (*see* CPL 190.30 [1]; *People v Mitchell*, 82 NY2d 509, 513 [1993]). In the same vein, the prosecutor enjoys "broad powers and duties, as well as wide discretion in presenting the People's case" to the grand jury (*People v Huston*, 88 NY2d 400, 406 [1996]; *see People v Lancaster*, 69 NY2d 20, 25 [1986]). Indeed, the prosecutor "determines the competency of witnesses to testify," and he or she "must instruct the jury on the legal significance of the evidence" (*People v Di Falco*, 44 NY2d 482, 487 [1978]; *see Huston*, 88 NY2d at 406).

Notably, though, due process imposes upon the prosecutor a "duty of fair dealing to the accused and candor to the courts," thus requiring the prosecutor "not only to seek convictions but also to see that justice is done" (*People v Pelchat*, 62 NY2d 97, 105 [1984]; *see Huston*, 88 NY2d at 406). This duty extends to the prosecutor's instructions to the grand jury and the submission of evidence (*Lancaster*, 69 NY2d at 26). The prosecutor also cannot provide "an inaccurate and misleading answer to the grand jury's legitimate inquiry" (*People v Hill*, 5 NY3d 772, 773 [2005]), nor can the prosecutor accept an indictment that he or she knows to be based on false, misleading or legally insufficient evidence (*see Pelchat*, 62 NY2d at 107).

Even under those principles, "[a] Grand Jury proceeding is not a mini trial, but a proceeding convened primarily to investigate crimes and determine whether sufficient evidence exists to accuse a citizen of a crime and subject him or her to a criminal prosecution" (*Lancaster*, 69 NY2d at 30 [internal

quotation marks and citations omitted]). That being so, the prosecutor need not tread too lightly in pressing the People's case or rebutting the defendant's assertions. For example, where the defendant chooses to testify, the prosecutor may, within limits, ask probing or even skeptical questions of the defendant about issues raised by his or her testimony (*see People v Germosen*, 86 NY2d 822, 824 [1995]; *People v Karp*, 76 NY2d 1006, 1008 [1990]; *People v Smith*, 84 NY2d 998, 1000-1001 [1994]; *People v Halm*, 180 AD2d 841, 842 [3d Dept 1992], *affd* 81 NY2d 819 [1993]). Similarly, in the role of legal advisor, the prosecutor need not instruct the grand jury on the full extent of its investigatory and deliberative powers (*see People v Harris*, 98 NY2d 452, 475 nn 5, 6 [2002]; *see also Lancaster*, 69 NY2d at 25-26). The prosecutor may decline to instruct the grand jury about a variety of defenses, and he or she need not disclose certain forms of exculpatory evidence or reveal to the grand jury the circumstances surrounding the authorities' investigation of the case (*see People v Robinson*, 89 NY2d 648, 653-654 [1997]; *Mitchell*, 82 NY2d at 513; *Lancaster*, 69 NY2d at 30; *People v Brewster*, 63 NY2d 419, 422-423 [1984]). These examples illustrate that, in occupying a "dual role as advocate and public officer" (*Pelchat*, 62 NY2d at 105), the prosecutor is not obligated to present the evidence or make statements to the grand jurors in the manner most favorable to the defense.

Of course, the grand jurors are empowered to carry out numerous vital functions independently of the prosecutor, for they "ha[ve] long been heralded as 'the shield of innocence . . . and as the guard of the liberties of the people against the encroachments of unfounded accusations from any source' " (*People v Sayavong*, 83 NY2d 702, 706 [1994], quoting *People v Minet*, 296 NY 315, 323 [1947]). Accordingly, CPL 190.50 grants the grand jury the power to subpoena witnesses, including witnesses not called by the People, and the prosecutor must comply with the grand jury's order for such testimony (CPL 190.50 [3]). If the grand jurors ask to hear from a witness, the prosecutor has no recourse to prevent the witness from appearing, save for a motion for an order vacating or modifying their subpoena on the ground that "such is in the public interest" (*id.*). In addition, the defendant may specifically ask the grand jury to exercise its power to call a witness of his or her selection, and "[t]he grand jury may as a matter of discretion grant such request and cause such witness to be called" (CPL 190.50 [6]). In the non-adversarial context of grand jury proceedings,

however, the defendant's statutory power to seek the appearance of a witness is one of "limited extent" (*Lancaster*, 69 NY2d at 26; *see Robinson*, 89 NY2d at 653).

The court may enforce these statutory rules by dismissing an indictment that "fails to conform to the requirements of [CPL article 190] to such degree that the integrity thereof is impaired and prejudice to the defendant may result" (CPL 210.35 [5]; *see* CPL 210.20 [1] [c]; *Hill*, 5 NY3d at 773). The "exceptional remedy of dismissal" is available in "rare cases" of prosecutorial misconduct upon a showing that, in the absence of the complained-of misconduct, the grand jury might have decided not to indict the defendant (*Huston*, 88 NY2d at 409, 410). In general, this demanding test is met only where the prosecutor engages in an "over-all pattern of bias and misconduct" that is "pervasive" and typically willful, whereas isolated instances of misconduct, including the erroneous handling of evidentiary matters, do not merit invalidation of the indictment (*id.* at 408, 409-410; *see Pelchat*, 62 NY2d at 106-107). "[T]he statutory test, which does not turn on mere flaw, error or skewing . . . is very precise and very high" (*People v Darby*, 75 NY2d 449, 455 [1990]).

■ Here, the prosecutors' comments on defendant's proffer relating to Jane Doe (or someone of that approximate description) neither suppressed defendant's request to call the witness nor stripped the grand jury of its discretion to grant or deny that request. The prosecutors allowed defendant to submit his request directly to the grand jurors, and defendant told the grand jurors at considerable length why he thought the witness's testimony to be relevant and worthwhile. Once defendant had completed his exhortation to call the witness, the prosecutors repeatedly acknowledged that the grand jurors could vote to hear from the witness and that the witness would be "subpoenaed if twelve or more of [them] vote[d]" to do so. "[A]s a matter of [their] discretion," the grand jurors then independently refused to "grant such request," thus exercising their prerogative under CPL 190.50 (6).

It is true that the lead prosecutor forcefully contended that the witness's testimony would be irrelevant, analogizing defendant's proffer to a plea for the testimony of random members of the community at large. She also told the grand jurors that they "ha[d] to take [her] advice" on that subject because she was their legal advisor; although she was indeed the grand jurors'

sole legal advisor, to whom they had to defer on most evidentiary issues, her remarks may have suggested an unduly expansive view of her powers. However, there was nothing inherently impermissible about the prosecutor's suggestion that the potential witness had no relevant testimony to offer, and the dissent does not appear to take a contrary position. In light of her advisory role and her duty to uphold the public interest in prosecuting crimes, the prosecutor surely had some leeway to argue her views on the admissibility of the proffered defense evidence (*see Mitchell*, 82 NY2d at 515; *Di Falco*, 44 NY2d at 487; *Lancaster*, 69 NY2d at 30). Furthermore, although the prosecutor probably should not have belabored her relevance argument, she made a valid point, as defendant's description of the witness and the witness's potential testimony did not provide an exact identification of the witness by name or clearly convey what the witness might say other than that she was present at the scene of the crime.

In any case, the lead prosecutor clarified that, despite her objections, the grand jurors had the right to call the witness based on their own belief regarding the relevance of the potential witness's testimony. As the prosecutor put it to the grand jurors, "if *you* believe—that *you* think that's relevant," the witness would be called (emphasis added). Indeed, at several points, the prosecutor generally acknowledged to the grand jurors that the decision to call or exclude the witness rested with them. Given those accurate instructions, the prosecutor's argument that the proposed testimony was irrelevant could not have misled the grand jurors into believing that they had no choice but to agree with her.

The grand jurors' assertive conduct further belies the notion that the prosecutors undermined the grand jurors' independence to such an extent as to impair the integrity of the second grand jury proceeding. Far from being a passive audience, the grand jury actively questioned the defense witnesses in an effort to gauge their stories against the People's witnesses's testimony. In a later exchange with the lead prosecutor, a grand juror pressed the prosecutor regarding the adequacy of her investigation into, and presentation of evidence regarding, defendant's physical ability to commit the crime.[1] And, when the

---

1. Specifically, the grand juror asked if defendant had been examined by a doctor and would have been able to jump over certain fences to escape the crime scene. The prosecutor replied that she believed defendant had testified

lead prosecutor questioned the relevance of the defense witness's proposed testimony, a grand juror repeatedly expressed skepticism, even going so far as to say that the prosecutor's assertions made no sense. Not only did the grand jurors still exercise their right to vote on defendant's request, but afterward, they voted to hear from two of Shawn Berry's proffered witnesses. Because the grand jurors fully exercised their independent decision-making authority over the course of the entire proceeding, there is no reason to believe that the prosecutors' statements about defendant's request cowed the grand jurors into abandoning their independence. Accordingly, the integrity of the grand jury proceeding remained intact, and the trial court properly denied defendant's motion to dismiss the indictment.

### III

The dissent would invalidate the indictment based on a number of perceived misdeeds committed by the prosecutors, but the circumstances cited by the dissent do not justify that exceptional remedy.

The dissent faults the second-seating prosecutor for indicating to the grand jurors that the witness at issue would not testify favorably to the defense (*see* dissenting op at 712). But, taken in context, that is not what the prosecutor said. After the lead prosecutor had asserted that defendant's proposed witness had no relevant testimony to offer, the second-seating prosecutor evidently sought to add some nuance to that contention, observing that, despite the firm view of her colleague that the proposed evidence could not be relevant, the evidence would, in fact, "be relevant, if [the witness] was going to give testimony in the defendant's favor." However, the second-seating prosecutor never claimed that the favorable nature of the testimony was the only way in which it could be relevant, but rather that it was a possible basis on which to reject her colleague's assertions about the relevance of the evidence. And, because the prosecutor did not equate relevance with favorability, her contention that the witness's testimony would not be relevant did not inappropriately signal that the testimony would be adverse to defendant.

Contrary to the dissent's interpretation of the record, the lead prosecutor never instructed the grand jury that the

to having completed his recovery by the time of the murder, but she cautioned that her recollection did not control the matter.

relevance of the witness's testimony "turn[ed] . . . upon whether James Doe's testimony was, in the prosecutor's estimation, sufficient to support an indictment" (dissenting op at 713). In the disputed remarks, the prosecutor stated:

> "Understanding that everything the defendant asks is not legally—he's not entitled to bring before you—This is not a trial. It's just whether or not there's probable cause, sufficient—legal, sufficient evidence to move forward with an indictment. It's not to have every witness known to mankind relevant to the proceeding . . . Just because he offers it—he talked about newspaper articles, what police officers told him. That is not legal evidence to come before you."

By this inartful declaration, the prosecutor merely made two legally accurate points: (1) a grand jury proceeding is an investigatory and accusatory process for deciding the existence of reasonable cause to bring a defendant to trial rather than an adversarial proceeding to determine guilt beyond a reasonable doubt (*see Lancaster*, 69 NY2d at 30); and (2) the admissibility of evidence turns on its relevance rather than the defendant's desire to see it admitted (*see Di Falco*, 44 NY2d at 487; *see generally People v Scarola*, 71 NY2d 769, 777 [1988]).

In alerting the grand jury to those two principles, the prosecutor never said that those rules were interdependent, such that the sufficiency of the evidence underlying the indictment controlled the relevance of the testimony of the defense witness. In fact, the prosecutor immediately informed the grand jurors that they could vote on whether they wanted to receive the witness's testimony, signaling that the prosecutor's belief in the sufficiency of the evidence did not preclude the grand jury from summoning the witness. Moreover, when the prosecutor later cited James Doe's testimony that defendant had shot Williams, she properly reiterated that the grand jurors could decide whether to call the witness and whether her testimony would be relevant, apparently without regard to James Doe's testimony.

Additionally, the dissent takes issue with the lead prosecutor's initial assertion that she did not know the identity of the witness mentioned by defendant (*see* dissenting op at 712). But, as the dissent concedes (*see id.*), the prosecutor soon thereafter dispelled any misconception by revealing that she was familiar with the witness to whom defendant had likely referred—Jane

Doe. Nor can the prosecutor be blamed for withholding this information when defendant first mentioned it, as defendant's conduct put the prosecutor in a difficult bind.

Sometime after the first grand jury proceeding, Jane Doe revealed to the People that she had received anonymous threats prior to her appearance before the first grand jury, and the People became concerned for her safety and privacy, eventually obtaining a protective order for her. Defendant threatened the People's justified concerns for Jane Doe's safety and the secrecy of the prior grand jury proceedings, however, when he told the second grand jury that Jane Doe had testified or appeared before the first grand jury and that the prosecutor knew her identity. No doubt alarmed that defendant had possibly breached the secrecy of the first grand jury, the prosecutor reasonably feigned ignorance of Jane Doe's identity to avoid confirming defendant's suspicion that Jane Doe had been a witness in the first grand jury and/or furthering a breach of grand jury secrecy by intimating to the grand jurors that their predecessors had heard from Jane Doe. Had she done otherwise, the prosecutor might have ended any hope she had of obtaining truthful testimony from Jane Doe in the future (*see Sayavong*, 83 NY2d at 708) and imperiled Jane Doe by revealing that she had cooperated in the prosecution of defendant. Indeed, it is presumably for these reasons that, in their response to defendant's renewed dismissal motion, the People expressed concern that he was trying to circumvent the secrecy of the grand jury, and they avoided revealing whether Jane Doe had testified before the first grand jury by asserting that her potential presence before that body did not matter. Even defendant seemed to recognize the witness safety issue, as he contended that the People could not avoid dismissal of the indictment by relying on their fear that the witness might be harmed as result of her grand jury testimony.[2]

---

**2.** The dissent suggests that the prosecutor was allowed to address these serious safety and secrecy issues only by waiting for the grand jury to order Jane Doe's appearance and then moving to vacate the grand jury's directive pursuant to CPL 190.50 (3) (*see* dissenting op at 714). However, if the prosecutor had simply acquiesced in defendant's request without expressing some ground for opposition, the grand jurors and defendant may very well have thought that the prosecutor was tacitly conceding Jane Doe's role as a witness before the first grand jury. And, if the prosecutor had thereafter applied for a motion to vacate a grand jury order for Jane Doe's testimony, the court could still have exercised its considerable "discretion" to deny the motion as inadequate to meet the less-than-clearly-defined requirement that vacatur be "in

■ Beyond its criticisms of the prosecutors, the dissent dismisses the strength of the evidence the People presented to the grand jury as insufficient to save the indictment, insisting that Jane Doe's testimony could have undermined the grand jury's finding of reasonable cause to believe that defendant had murdered Williams (*see* dissenting op at 714-716). As the dissent observes, the legal sufficiency of the evidence supporting an indictment, standing alone, does not automatically immunize the indictment from dismissal, and a defendant's conviction after trial does not necessarily cure defects in an indictment (*see Huston*, 88 NY2d at 410-411). Still, "[i]n the ordinary case, it may be said that the Grand Jury has properly carried out [its] function when it has issued an indictment upon evidence that is legally sufficient to establish that the accused committed a crime" (*People v Calbud, Inc.*, 49 NY2d 389, 394 [1980]), and dismissal is meant to eliminate only prosecutions that are truly unfounded, as opposed to those that merely rest on a view of the evidence that is not comprehensive (*see People v Valles*, 62 NY2d 36, 38-39 [1984]).

Here, no one disputes that the evidence was legally sufficient to support the indictment and that therefore the prosecution of defendant was not completely unfounded. Furthermore, given that the petit jury heard from Jane Doe and concluded that her testimony did not create a reasonable doubt as to defendant's guilt, it is hard to imagine that her testimony before the grand jurors would have altered their determination that the evidence met the less exacting standard of reasonable cause. That is particularly so in light of James Doe's unequivocal testimony that defendant shot Williams in broad daylight and John Doe's description of the shooter which, while inconsistent with defendant's appearance in some respects, still suggested that

---

the public interest" (CPL 190.50 [3]). Indeed, it was not far-fetched for the prosecutor to fear that, if she did not immediately respond to defendant's statements about Jane Doe's role as a prior grand jury witness, the trial court might later rely on defendant's comments to conclude that there was no longer any reason to quash a subpoena issued by the grand jury; by that time, the prosecutor would have arguably allowed defendant to let the proverbial cat out of the bag without opposition. Tellingly, in his dismissal motions, even defendant did not assert that the prosecutor should have awaited a subpoena and then quashed it rather than rebutting defendant's offer of proof during the grand jury proceeding. In any event, although the prosecutor might have been better advised to pursue a motion to quash, her failure to take that step was not the sort of pervasive misconduct that would impair the integrity of the grand jury proceeding.

defendant was the shooter.[3] Therefore, any "mere flaw, error or skewing" by the prosecutors did not satisfy the "very precise and very high" test for dismissal of this indictment, which was supported by reasonable cause to believe that defendant had committed the charged crimes (*Darby*, 75 NY2d at 455).

*People v Hill* (5 NY3d at 772) does not support the dissent's position in this case. In *Hill*, the defendant's attorney sent the prosecutor a letter requesting that the prosecutor call eight alibi witnesses to testify in front of the grand jury (*see id.* at 773; *see also id.* at 774-778 [R.S. Smith, J., dissenting]). The letter listed each witness by name and a brief description of the events about which the witness would testify (*see id.* at 774). The prosecutor informed the grand jurors that the defendant wanted to call the eight witnesses, but the prosecutor did not provide the grand jurors with any of the detailed information contained in counsel's letter (*see id.* at 773; *see also id.* at 774-775). The grand jurors specifically asked about the nature of the witnesses' testimony, and the prosecutor still claimed not to know what the witnesses would testify about (*see id.* at 773; *see also id.* at 774-775). The grand jurors voted not to call the witnesses (*see id.* at 773; *see also id.* at 775). We affirmed the dismissal of the indictment, holding that, "under the circumstances of this case, the prosecutor gave an inaccurate and misleading answer to the grand jury's legitimate inquiry, thus substantially undermining the integrity of the proceeding and potentially prejudicing defendant" (*id.*).

In the instant case, unlike *Hill*, the prosecutors did not hide the full extent of defendant's offer of proof, which defendant himself made to the grand jury. And, here, defendant's identification of the witness as someone who had testified before the first grand jury required the prosecutors to avoid acknowledging that fact to protect the secrecy of the first grand jury,

---

**3.** Indeed, there were only minor differences between: (1) John Doe's description of the shooter, who was reportedly a light-skinned black or Hispanic man with a shapely beard, blotchy complexion, short-cut black Timberland boots, dark pants, and a black hoodie; and (2) defendant, who, according to the officers who testified in the first grand jury, was a light-skinned black man with a goatee, wore black sneakers, and wore dark pants. And, although the parties have not provided us with the police officers' testimony, if any, before the second grand jury, it is notable that, at trial, the officers testified that defendant was arrested near a discarded black hoodie. Ultimately, the grand jurors observed defendant in person in the grand jury room and indicted him despite the alleged differences between his appearance and that of the shooter described by John Doe.

whereas there was no such issue in *Hill*. Furthermore, while the prosecutor in *Hill* never fully disclosed his knowledge of the witnesses and their proposed testimony, the lead prosecutor here eventually told the grand jurors that her office had spoken with the witness at issue in the course of its investigation. Thus, the prosecutors here did not hide defendant's proffer from the grand jury or engage in any misconduct equivalent to that which led to the dismissal of the indictment in *Hill*.

## IV

In this case, the prosecutors did not commit pervasive misconduct, nor does the record indicate that they were motivated by bias or a desire to deceive the grand jury when they responded to defendant's request for Jane Doe's testimony. At most, the prosecutors made isolated missteps that could not have affected the outcome of the grand jury proceeding. We do not endorse the prosecutors' actions as the preferred way to present a case to the grand jury, but we decline to dispose of the well-founded prosecution here as a result of their handling of the matter. Moreover, upon reviewing defendant's claims regarding the trial proceedings, we find that they do not warrant reversal of his conviction. Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting). On the morning of October 10, 2003 Rasheem Williams was fatally shot in the head as he stood at the corner of Gordon and Broad Streets in Staten Island. Defendant was stopped by police officers about one quarter hour later several blocks from the scene of the shooting. At that time, he was reportedly wearing a white tee shirt, dark jeans and black sneakers. Although defendant was not in the near aftermath of the Williams murder identified as its perpetrator, he was arrested on charges of gun possession. Those charges were presented to a grand jury on the theory that defendant could be linked to weapons and clothing found hidden in an abandoned back lot on Hudson Street, a venue situated along a route leading from the place of the Williams shooting to the place defendant was stopped. The evidence supporting the posited linkage included testimony purporting to show that a police dog tracked defendant's scent to the spots where the weapons and clothing had been secreted, and testimony that a person seen running from the shooting scene had been attired in a dark-colored hoodie resembling one of the garments recovered from the Hudson Street back lot. From this proof the

People sought to invite inferences that it was defendant who was observed fleeing north on Broad Street immediately after the shooting and who, shortly before being stopped by the police on Gray Street, deposited the weapons, hoodie and other recovered items, including a silencer and a black hat, in the nearby back lot. There was, however, evidence before the grand jury not entirely consonant with this scenario. Although the witness we now refer to as "John Doe" lent some support to the People's theory by testifying that he saw a person running up Gordon Street just after the shooting wearing a dark hoodie and jeans, and cradling what appeared to be a gun barrel in his shirt, he also stated that that individual had a "blotchy" complexion, a long shapely beard and wore Timberland boots. Defendant possessed neither distinctive facial characteristic and, as noted, was clad in sneakers when stopped. In addition, a witness we now refer to as "Jane Doe" testified that the individual she saw come up behind Williams as she conversed with him, fire the fatal shots at close range and then run up Gordon Street, wore a brown hoodie bearing a Burberry plaid pattern. The black garment recovered in the Hudson Street lot sported no such pattern. The grand jury declined to vote a true bill as to any of the submitted weapon possession counts.

Thereafter, an individual we refer to as "James Doe" came forward, claiming that he witnessed defendant, with whom he was acquainted, shoot Rasheem Williams. The People obtained permission to re-present charges against defendant stemming from the Williams shooting, and, in November 2003, James Doe testified before a grand jury new to the matter. He stated that on the morning of the shooting he noticed defendant sitting in a car parked on Broad Street holding a gun with a long barrel. He reported that a while later—after encountering Rasheem Williams down the block, chatting with an ex-girlfriend and buying a cup of coffee—he watched as defendant approached Williams and shot him in the back of the head. Defendant, he said, was wearing a hoodie, blue jeans and a black hat.

The second grand jury also heard testimony from John Doe. He stated, as he had before the first grand jury, that shortly after the shooting he saw a man fleeing up Gordon Street holding what appeared to be the barrel of a gun in the folds of his shirt. The man, he said, wore a dark hoodie and Timberland-like boots, and had an unusual "blotchy" complexion which he supposed might have been caused by a disease. John Doe noted in passing that he encountered a friend—a person having the same moderately distinctive first name as Jane Doe—at the scene of the shooting.

Jane Doe was not called by the People to testify before the second grand jury. In concluding his own testimony, however, defendant announced, "I have additional facts, that on October 10th there was a witness to this crime. It was a young lady. And [she] was brought to the precinct." This precipitated the following contentious exchange:

"[PROSECUTOR]: Hold on a minute. Were you there on October 10th at the time of the murder?

"[DEFENDANT]: Was I there? No.

"[PROSECUTOR]: So how would you know there was a witness to the crime?

"[DEFENDANT]: How? When I was brought to the police station and the police told me—

"[PROSECUTOR]: . . . that is hearsay, and you cannot talk about hearsay . . .

"[DEFENDANT]: The District Attorney will not let me talk about a witness. I have her name and, you, the Grand Jury, have the permission to call this girl. They have her name and address. She was brought here to the last Grand Jury . . . this person is a witness to this crime. . . .

"[PROSECUTOR]: How do you know that?

"[DEFENDANT]: She was brought—they told me there was a witness to the crime.

"[PROSECUTOR]: And what is the relevance? . . .

"[PROSECUTOR]: Do you know that she testified to [witnessing the crime], because . . . if you are speculating as to whether or not she testified that somebody else did the crime, that is not relevant for [the grand jurors'] consideration. . . .

"[DEFENDANT]: . . . I'm asking you, please, you have the power to call this young lady . . . Her name is [listing several appellations, among them Jane Doe]. The District Attorney has her address. She was brought here to testify. . . .

"[PROSECUTOR]: Did you speak to her?

"[DEFENDANT]: I never spoke to her—

"[PROSECUTOR]: And did she tell you what she testified to in Grand Jury or what she was going to say?

"[DEFENDANT]: You would know—

"[PROSECUTOR]: I wouldn't know, because I don't have any idea who you're talking about."

After defendant was excused, a grand juror asked to hear from the witness to whom the juror supposed defendant was referring; the juror understood that witness to be the friend that John Doe mentioned seeing at the scene of the shooting. The prosecutor responded that the witness's testimony "is not relevant to this proceeding." The requesting grand juror protested that she did not understand how a witness to the central events would not have relevant testimony, but was rebuffed, the prosecutor instructing that "[i]t's in [the prosecutors'] purview to decide that." The juror persisted, asking if the grand jury could vote on whether to call Ms. Doe, and this colloquy ensued:

"[FIRST PROSECUTOR]: . . . based on our investigation and what's been testified to, and I'm skating a thin line here, I think at this point, it's six-thirty, we have to make a lot of determinations right now. Additionally, based upon our investigation, and *it's up to you whether to have that witness, but I'm telling you that it is not relevant to this proceeding. You have to take our advice, as your legal advisors, that it is not relevant to the situation at hand.*

"JUROR: How?

"[SECOND PROSECUTOR]: However, it would be relevant, if she was going to give testimony in the defendant's favor. It's our determination, she is not relevant.

Any other questions?

"JUROR: So, basically she would be for you guys, if not, why wouldn't you want us to hear?

"[FIRST PROSECUTOR]: The testimony she would have given to you is not relevant.

"JUROR: How do you know that her testimony—

"[FIRST PROSECUTOR]: Based upon our investigation and interviews of her.

"JUROR: So why is he so insistent on having her?

"[FIRST PROSECUTOR]: Understanding that everything the defendant asks is not legally—he's not entitled to bring before you—This is not a trial. It's just whether or not there's probable cause, sufficient—legal, sufficient evidence to move forward with an indictment. *It's not to have every witness known to mankind relevant to this proceeding . . . not everybody in society that was on the face of the planet that day coming before the Grand Jury*" (emphasis added).

The prosecutor then agreed to allow the grand jury to vote on whether to call Jane Doe, but first purported to "marshal the evidence," reminding the jury that they heard testimony "[from] an eyewitness [James Doe] who identified the defendant at the scene as the shooter," and suggesting that, in light of James Doe's identification, whatever Ms. Doe would say would not be "really relevant."

The grand jury, acting in accord with the prosecutors' assertedly binding advice, voted not to call Ms. Doe. Directly afterward it voted to indict defendant for Rasheem Williams' murder and related weapons possession charges.

Before trial, defendant moved to dismiss the indictment pursuant to CPL 210.35 (5), i.e., upon the ground that the underlying proceeding "fail[ed] to conform to the requirements of [CPL] article one hundred ninety to such degree that the integrity thereof is impaired and prejudice to the defendant may result." Prominent among the grounds for the application was the prosecutors' handling of defendant's request that Ms. Doe be called as a witness.[1] In opposing the application the People urged only that defendant had not adequately identified the witness whose testimony he sought, that his request was "flimsy," and that whether Jane Doe testified before the grand jury was irrelevant. There was no mention of any need to protect Ms. Doe or to shield from disclosure to the second grand jury the fact and substance of her testimony before the first grand jury. Dismissal was summarily denied and the matter proceeded to trial. The

---

**1.** Also cited were the presenting prosecutor's insinuations that defendant had committed crimes other than those that were the subject of the proceeding.

first trial of the indictment ended in a hung jury. Defendant was finally convicted of second degree murder and second and third degree criminal possession of a weapon after lengthy jury deliberation at the retrial. In affirming the judgment of conviction (81 AD3d 670 [2011]), the Appellate Division, while faulting the prosecutor's suggestion in front of the grand jury that defendant had committed crimes other than those alleged within the presentment proceeding, deemed the exceptional remedy of dismissal pursuant to CPL 210.35 (5) unwarranted in light of the properly admitted proof supporting the indictment (*id.* at 671). The court did not in its decision address the manner in which the prosecutor dealt with defendant's witness request.

The grand jury, we have observed, is a "constitutionally and historically independent institution" (*People v Huston*, 88 NY2d 400, 401 [1996]) intended to function as a buffer between the state and its citizens and as a check upon prosecutorial excess (*People v Calbud, Inc.*, 49 NY2d 389, 396 [1980]). A prosecutor, then, in presenting a matter to a grand jury and simultaneously acting as its statutorily designated legal advisor (*see* CPL 190.25 [6]), although possessing broad discretion as to the evidence to be adduced in support of any formal accusation sought (*People v Lancaster*, 69 NY2d 20, 25-26 [1986]), is at the same time bound to respect the grand jury's essential independence and may not thwart that body's satisfaction of its core investigative purpose. The grand jury, we have said "ought to be well informed concerning the circumstances of the case before it" (*id.* at 25).

While, as a practical matter, the evidence before a grand jury will largely be a function of prosecutorial discretion as to what is relevant and fair in enabling the panel's constitutionally required judgment as to whether there are adequate grounds for prosecution, there are important statutory limits upon the power of a prosecutor unilaterally to determine what evidence will and will not be placed before the grand jury—limits essential to maintaining the institutional integrity of the grand jury and to characterizing its work as the product of independent judgment.

Foremost among these is the grand jury's broad and autonomous power to "call[ ] as a witness any person believed by it to possess relevant information or knowledge" (CPL 190.50 [3]). This power expressly extends to witnesses *not* called by the People; indeed, the People "must comply with [the grand jury's] direction" to serve a subpoena, even when they do not agree that the requested witness should be called (*id.*). Relatedly, the

person who is the subject of the grand jury proceeding must be afforded the opportunity to testify before the investigating panel (CPL 190.50 [5]) and "may request the grand jury, either orally or in writing, to cause a person designated by him to be called as a witness in such proceeding" (CPL 190.50 [6]). Such a request may be made by a defendant in the course of grand jury testimony (*see People v Mitchell*, 82 NY2d 509, 515 [1993] [referring to a defendant's right to bring exculpatory evidence to the grand jury's attention by her own testimony]). The statute is explicit that the grant or denial of such a request is a matter lying within the discretion of the grand jury, not the prosecutor, and that if the request is granted the designated witness's appearance may be caused pursuant to CPL 190.50 (3), i.e., as the appearance of a person *"believed by [the grand jury] to possess relevant information or knowledge"* (emphasis added).

Here, the presenting prosecutors lost sight of these limitations and, in so doing, impermissibly substituted their discretion for that legally committed to the grand jury. The prosecutor knew that Jane Doe had been identified and interviewed as a witness to the Williams shooting, and indeed that she had at her office's request testified before the first grand jury, before which she had given an account essentially favorable to defendant. Nevertheless, after first (while the defendant was present) professing ignorance of the requested witness's existence, she said to the grand jurors that, while she did know who Ms. Doe was, her testimony would be irrelevant, an assertion which understandably nonplussed at least one grand juror, since it appeared from John Doe's testimony that Ms. Doe had been present at the scene during or immediately after the shooting. The prosecutor then incorrectly instructed that it was the purview of her office to decide whether the requested testimony was relevant and that the grand jury was obliged to take her office's advice that Ms. Doe's testimony would be irrelevant. This was contrary to CPL 190.50, subdivisions (6) and (3), which, as noted, empower the grand jury to exercise its discretion to call any witnesses *"believed by it* to possess relevant information" (emphasis added). Matters were not improved when the second prosecutor suggested, inaccurately, that what Ms. Doe had to say would not be favorable to defendant.[2] And, although the

2. The majority protests that the second prosecutor's statement, "[h]owever, it would be relevant, if she was going to give testimony in the defendant's favor," merely added nuance to the first prosecutor's categorical

grand jury was in the end permitted to vote on whether to call Jane Doe, the vote did not take place before the prosecutor reminded the jurors that it was 6:30 and they had to "make a lot of determinations right now," and then led the jury to understand that, given James Doe's testimony identifying defendant as Mr. Williams' assailant, additional testimony would be irrelevant and a waste of valuable time. But the relevance of Jane Doe's account did not turn at all upon whether James Doe's testimony was, in the prosecutor's estimation, sufficient to support an indictment and, obviously, was not fairly equated with what "everybody . . . on the face of the planet" the day of the shooting might have to say. It was the grand jury, and not the prosecutor, that was the proper judge of the facts with respect to the matter before it (*People v Pelchat*, 62 NY2d 97, 105 [1984]; CPL 190.25 [5]), both as to their legal sufficiency and the closely enmeshed question of whether they provided reasonable cause to believe defendant had committed the alleged crimes (*People v Batashure*, 75 NY2d 306, 310-311 [1990]). The grand jury was not bound to accept James Doe's account, particularly if it was inconsistent with other eyewitness accounts. The prosecutor's contrary suggestion—that narratives competing with the one offered by James Doe could be dismissed as irrelevant and thus need not be explored at all—impinged upon and abridged the grand jury's basic investigative and fact-finding functions.

The prosecutors' misstatements of fact and law were inconsistent with the People's obligations of candor and fair dealing as officers of the court and advisers to the grand jury (*see Pelchat*, 62 NY2d at 105). They did not merely suggest "an unduly expansive view" (majority op at 700) of the prosecutor's power. Nor did they constitute permissible argument as to the admissibility of the proffered defense evidence (majority op at 700). What the prosecutor said as to the relevance of that evidence and the purportedly plenary power of her office to determine evidentiary relevancy in the context of a defendant's witness request was very misleading. It is not sensible to suppose, as the majority does, that this misadvice from the grand jury's

pronouncement that Ms. Doe's testimony was not relevant, and did not necessarily mean that Ms. Doe's account was not exculpatory. While this parsing is logically correct, the fact remains that the most accessible meaning was the one the juror actually drew—that Ms. Doe's testimony not only would not be exculpatory but that "basically she would be for [the prosecution]." Even if the second prosecutor's comment was only intended to add nuance, it was demonstrably misleading.

designated legal advisor did not compromise the grand jury's investigative function or defendant's dependent right to request witnesses. The votes that followed in the wake of those misstatements cannot be viewed as expressions of the indicting body's independent and well-informed judgment. Possibly the People had valid reasons to oppose Ms. Doe's testimony (e.g., concern for the witness's safety), but those should have been interposed, if at all, pursuant to CPL 190.50 (3), in a motion to vacate a grand jury direction for her appearance or to quash a subpoena issued to her,[3] or in opposition to defendant's motion to dismiss the indictment pursuant to CPL 210.35 (5). The grounds upon which such a motion might have been premised are not appropriately asserted for the first time on appeal as they have been in this litigation. In any event, the elaborate post hoc rationalization of need (majority op at 703-705) for the prosecutors' representations to the grand jury is purely speculative and, oddly, appears to rest upon the uncertain availability of relief pursuant to CPL 190.50 (3). Surely the majority does not suggest that the possibility a court would exercise its discretion to deny a prosecutor's motion to quash a grand jury subpoena could ever justify a prosecutor in misleading a grand jury as to the relevance of a murder witness's testimony. The statute exists precisely to obviate the need for bringing purely prosecutorial interests possibly conflicting with the prosecutor's duty of neutral advisement within the grand jury chamber directly to bear upon the grand jury's exercise of its power to call witnesses "*believed by it* to possess relevant information."

It is true that the standard for dismissal of an indictment pursuant to CPL 210.35 (5) for statutory nonconformities impairing the integrity of the underlying grand jury proceeding is exacting (*People v Darby*, 75 NY2d 449, 455 [1990]). But the recitation of the standard does not decide the particular claim and defendant's claim, I believe, merits relief.

---

**3.** The statute provides in relevant part:
"At any time after such a direction [by the grand jury to call a witness], however, or at any time after the service of a subpoena pursuant to such a direction and before the return date thereof, the people may apply to the court which impaneled the grand jury for an order vacating or modifying such direction or subpoena on the ground that such is in the public interest. Upon such application, the court may in its discretion vacate the direction or subpoena, attach reasonable conditions thereto, or make other appropriate qualification thereof."

In *People v Hill* (5 NY3d 772 [2005]) we upheld the dismissal of an indictment pursuant to CPL 210.35 (5) where the presenting prosecutor undermined the defendant's witness request by withholding from the grand jury basic information at his disposal bearing upon the relevance of the sought testimony. We reasoned that the prosecutor's failure to furnish the information on the ground that he could not disclose what he did not know, was misleading and left the grand jury with no basis to determine, in accordance with CPL 190.50 (6), whether the witness request should be granted (*id.* at 773). The conduct in this case, involving a far more aggressive assertion of prosecutorial influence to undermine what was on its face a legitimate CPL 190.50 (6) request for the testimony of a potentially pivotal witness, strikes even more profoundly at the integrity of the proceedings.

The further finding required as a condition of relief—that there "may" be consequential prejudice to the defendant (CPL 210.35 [5]; *Huston*, 88 NY2d at 409)—is, on this record, also justified. Ms. Doe testified before the grand jury that declined to return a true bill against defendant. The possibility that her plainly relevant testimony would have been sought by the second grand jury if not for the prosecutors' very serious mishandling of defendant's witness request and would have been instrumental to an outcome similarly favorable to defendant cannot be discounted.

The People, and now the majority, stress that by the time of the second grand jury presentation the testimony of James Doe had been obtained and that that testimony was legally sufficient to sustain the indictment. But this misses the point. It was up to the grand jury not only to determine whether the evidence was sufficient but whether there was reasonable cause to believe defendant had done the things of which he was accused (CPL 190.65 [1]; *and see Huston*, 88 NY2d at 411 ["the CPL requires not only legally sufficient evidence as a prerequisite to indictment but also reasonable cause to believe the person committed an offense"]), an exercise involving weighing the evidence (CPL 70.10 [2]). James Doe's identification of defendant as Rasheem Williams' shooter was essentially the only evidence before this grand jury linking defendant to the crime. The People did not present, as they had to the previous grand jury, evidence relating to the clothes and weapons found in the Hudson Street lot. But James Doe's identification, in respects not lost upon the grand jurors, was inconsistent with John Doe's description of

the person he saw running from the scene,[4] and might well have been further cast in question by Jane Doe's description of the shooter. The grand jury could have resolved the testimonial conflicts differently had it heard from Ms. Doe, and a substantial possibility of a different outcome is all the statute requires in the way of prejudice where, as here, the integrity-impairing conduct is pronounced (*see Huston*, 88 NY2d at 409 ["The likelihood of prejudice turns on the particular facts of each case, including the weight and nature of the admissible proof adduced to support the indictment *and the degree of inappropriate prosecutorial influence or bias*"] [emphasis added]).

That the grand jury voted upon the witness request cannot be a saving factor here any more than it was in *Hill*. The salient point, which the majority overlooks in attempting to distinguish *Hill*, is that in each case the prosecutor's conduct deprived the grand jury of potentially outcome-determinative information essential to the discharge of its core constitutional obligation. Where that occurs, there can be no supposition that the grand jury would otherwise have voted as it did. Such a supposition only rewards conduct that CPL 210.35 (5) exists to deter.

The majority's minimization of what was a very serious prosecutorial misstep to treat this as an "ordinary case [in which] it may be said that the Grand Jury has properly carried out [its] function when it has issued an indictment upon evidence that is legally sufficient" (majority op at 704, quoting *Calbud, Inc.*, 49 NY2d at 394) significantly neuters CPL 210.35 (5) as a deterrent to improper prosecutorial influence during secret grand jury proceedings. While the exercise saves a conviction, it also practically eliminates the utility of a powerful, legislatively prescribed disincentive to the sort of prosecutorial overreaching that results in unfounded prosecutions. Accordingly, I dissent.

I would reverse and grant the motion to dismiss the indictment, with leave to re-present (*see People v Morris*, 93 NY2d 908 [1999]; CPL 210.20 [6] [b]).

Judges GRAFFEO, READ and PIGOTT concur with Judge ABDUS-SALAAM; Chief Judge LIPPMAN dissents in an opinion in which Judges SMITH and RIVERA concur.

Order affirmed.

---

4. Obviously attempting to reconcile John Doe's description with James Doe's identification, a juror specifically inquired of defendant whether he had had blotches or rashes on his face at the time of the Williams shooting.