People v Malloy (2018 NY Slip Op 07977)





People v Malloy


2018 NY Slip Op 07977


Decided on November 21, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 21, 2018

108394

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
EDWARD MALLOY, Also Known as EB, Appellant.

Calendar Date: September 11, 2018

Before: Garry, P.J., Clark, Mulvey, Rumsey and Pritzker, JJ.


Paul J. Connolly, Delmar, for appellant, and appellant
pro se.
P. David Soares, District Attorney, Albany (Vincent Stark of counsel), for respondent.



MEMORANDUM AND ORDER
Mulvey, J.
Appeal from a judgment of the Supreme Court (Mott, J.), rendered March 11, 2016 in Albany County, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the second degree.
Following a jury trial, defendant was convicted of murder in the second degree and criminal possession of a weapon in the second degree. The charges stemmed from a February 16, 2014 incident outside a tavern in the City of Albany during which the victim was shot multiple times and killed. Defendant was sentenced to consecutive prison terms of 22 years to life on the murder conviction and seven years, followed by five years of postrelease supervision, on the criminal possession of a weapon conviction. He now appeals.
Initially, we reject defendant's contention that the indictment must be dismissed because the integrity of the grand jury proceeding was impaired. A grand jury proceeding that yields an indictment is defective when it "fails to conform to the requirements of [CPL article 190] to such degree that the integrity thereof is impaired and prejudice to the defendant may result" (CPL 210.35 [5]). Although a "defendant need not demonstrate actual prejudice under this statutory scheme to prevail" (People v Sayavong, 83 NY2d 702, 709 [1994]), "[d]ismissal of an indictment pursuant to CPL 210.35 (5) is a drastic, exceptional remedy and should thus be [*2]limited to those instances where prosecutorial wrongdoing, fraudulent conduct or errors potentially prejudice the ultimate decision reached by the grand jury" (People v Sutherland, 104 AD3d 1064, 1066 [2013] [internal quotation marks, brackets and citations omitted]; see People v Thompson, 22 NY3d 687, 699 [2014]; People v Huston, 88 NY2d 400, 409 [1996]).
The minutes of the grand jury presentment reflect three instances where a grand juror acknowledged that he/she knew a witness [FN1]. In each instance, the prosecutor inquired whether there was anything concerning the grand juror's knowledge of the witness that would lead the grand juror to believe that he/she could not be fair and impartial, and each answered in the negative (see People v Richardson, 132 AD3d 1239, 1241 [2015]; People v Farley, 107 AD3d 1295, 1296 [2013], lv denied 21 NY3d 1073 [2013]; compare People v Revette, 48 AD3d 886, 888 [2008]). While we agree with defendant that the precise nature of the relationship between each grand juror and the particular witness should have been further explored by the prosecutor (see generally People v Revette, 48 AD3d at 887-888), we do not find the exceptional remedy of dismissal to be warranted under the facts and circumstances of this case. The salient evidence against defendant during the grand jury presentment came not from the testimony of any of the civilian witnesses who were present on the evening of the incident, but from the extensive surveillance video footage that captured the shooting itself and the events that unfolded both prior and subsequent thereto. Indeed, the testimony of the three witnesses at issue proved to be of little, if any, consequence; such testimony tended neither to incriminate nor exonerate defendant and, in large measure, did nothing more than confirm their presence at the scene. Mindful that "the statutory test, which does not turn on mere flaw, error or skewing . . .[,] is very precise and very high" (People v Darby, 75 NY2d 449, 455 [1990]; accord People v Thompson, 22 NY3d at 699; People v Baptiste, 160 AD3d 976, 978 [2018], lv denied 31 NY3d 1145 [2018]), we find no "articulable 'likelihood of' or . . . 'potential for' prejudice" stemming from the grand jurors' prior knowledge of the witnesses in question (People v Adessa, 89 NY2d 677, 686 [1997]; see People v Piznarski, 113 AD3d 166, 181 [2013], lv denied 23 NY3d 1041 [2014]; People v La Duca, 172 AD2d 1054, 1055 [1991]).
Defendant next challenges the verdict as unsupported by legally sufficient evidence and against the weight of the evidence, primarily arguing that the People's proof — which was largely circumstantial in nature — failed to establish his identity as the shooter [FN2]. "[E]ven in circumstantial evidence cases, the standard for appellate review of legal sufficiency issues is 'whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People'" (People v Hines, 97 NY2d 56, 62 [2001], quoting People v Williams, 84 NY2d 925, 926 [1994]; accord People v Reichel, 110 AD3d 1356, 1363 [2013], lv denied 22 NY3d 1090 [2014]). When conducting a weight of the evidence review, we must [*3]"first determine, based on all of the credible evidence, whether a different result would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the [proof] to determine if the verdict is supported by the weight of the evidence" (People v Wilson, 164 AD3d 1012, 1013 [2018]; see People v Danielson, 9 NY3d 342, 348 [2007]).
The People's theory of the case was that defendant intentionally shot and killed the victim as the culmination of an ongoing, heated altercation between the two that transpired less than an hour earlier. Because the murder weapon was never discovered and none of the individuals who were undisputedly present at the scene claimed to have witnessed the killer in the act of shooting, the People relied heavily upon surveillance video footage taken from cameras located in the interior and exterior of the tavern, as well as video footage obtained from a City-owned street camera positioned approximately 100 yards south of the tavern. Taken together, the footage shows that defendant and the victim separately arrived at the tavern at approximately 3:00 a.m. on the morning of February 16, 2014. While outside, they are seen exchanging words and engaging in physical contact, with defendant ultimately pushing the victim to the ground. The two thereafter proceeded inside where the verbal dispute continued, causing the tavern's bouncer to intervene in an effort to stop what he perceived to be an imminent altercation. "While this proof of a potential motive does not establish an element of the crime, it cannot be ignored" (People v Stanford, 130 AD3d 1306, 1307 [2015] [internal quotation marks and citations omitted], lv denied 26 NY3d 1043 [2015]; see People v Marin, 65 NY2d 741, 745 [1985]; People v Thibeault, 73 AD3d 1237, 1239-1240, [2010], lv denied 15 NY3d 810 [2010], cert denied 562 US 1293 [2011]).
The victim exited the tavern roughly 10 minutes later, after which defendant can be seen making several calls on his cell phone. Soon thereafter, a Buick Rendezvous being driven by defendant's girlfriend, Marika Hodge, arrives and parks in front of the tavern. As Hodge enters the tavern, defendant immediately gets up from his seat and walks to the rear of the establishment. Hodge follows, with her right hand stiffly in her coat pocket. The two then proceed to enter the bathroom and reemerge approximately 20 seconds later, with Hodge's hand now swinging freely beside her. Defendant, Hodge and several others — including Marquetta Jackson, a mutual friend of defendant and the victim — thereafter remain in the tavern until approximately 3:30 a.m., when the tavern begins to close down.
Once outside, defendant — who appears in a visibly agitated state — can be seen pacing and looking around while placing his hand behind his back as if attempting to grasp something. Moments later, an animated conversation transpires between defendant and Hodge during which Hodge is depicted grabbing at defendant and reaching around his backside in an apparent attempt to pull something away from him. At this point, video surveillance captures defendant holding a gun behind his back before eventually secreting it in his rear waistband. Meanwhile, from the street camera, the victim can be observed exiting his vehicle and walking to a small parking lot located approximately 20 to 25 feet south of the tavern. Jackson — who had made three successive attempts to contact the victim during the brief period since she and the others exited the tavern — then leaves the front of the establishment and can be seen on footage from the street camera walking in the direction of the victim. When defendant went to follow, Hodge attempted to physically restrain him and the two grappled before defendant eventually pulled away. Defendant then proceeded to the parking lot where the victim and Jackson were located, followed by Hodge and defendant's two cousins, Eshod Malloy and William Bonds. Soon thereafter, a woman is shown exiting a vehicle and joining the group. Among these six [*4]individuals who joined the victim, only defendant was wearing a dark top and light-colored pants.
Less than a minute later, the victim can be seen taking a step back and then collapsing to the ground. While the street camera depicted the murder, it was not of such quality that the identity of the shooter is apparent. As the group flees the scene, two individuals are visible running into the street together and then proceeding to the vehicle that Hodge had arrived in earlier. Notably, the taller of the two appears to be wearing pants of a slightly lighter color than his/her top. As the taller figure begins to enter the passenger side of the vehicle, a silhouette of what appears to be a gun is visible in this individual's hand.
A detective who investigated the crime scene found six .45 caliber shell casings arranged more or less in a linear formation within feet of the victim's body. The People also called an expert in the field of firearms, who examined the shell casings at issue and opined that they were fired from the same gun. Upon execution of a search warrant at defendant's home, police discovered two live .45 caliber rounds in the dresser drawer of a bedroom. An autopsy determined that the victim suffered gunshot wounds to his chest, hip, forearm and hands, and that his death was caused by a gunshot wound to the neck. Based upon the trajectory of the fatal bullet, the medical examiner who performed the autopsy concluded that either the shooter was directly above the victim or the victim was bending toward the shooter at the time of impact.
Viewing the foregoing evidence in the light most favorable to the People, we find that it was legally sufficient to support defendant's convictions of these crimes. "In the end, it is a question whether common human experience would lead a reasonable [person], putting his [or her] mind to it, to reject or accept the inferences asserted for the established facts" (People v Wachowicz, 22 NY2d 369, 372 [1968] [citations omitted]; accord People v Davis, 41 NY2d 678, 679 [1977]; see People v Ford, 66 NY2d 428, 432 [1985]; People v Harris, 88 AD3d 83, 86-87 [2011], revd on other grounds 19 NY3d 679 [2012]). Contrary to defendant's contention, there were sufficient established facts from which permissible inferences could be drawn to lead a reasonable person to conclude that it was defendant who fatally shot the victim with the weapon seen in his possession just minutes before and immediately following the slaying (see People v Callicut, 101 AD3d 1256, 1257-1259 [2012], lvs denied 20 NY3d 1096, 1097 [2013]; People v Jackson, 100 AD3d 1258, 1259-1261 [2012], lv denied 21 NY3d 1005 [2013]; People v Brown, 46 AD3d 949, 951 [2007], lv denied 10 NY3d 808 [2008]; People v Ruiz, 211 AD2d 829, 830 [1995], lv denied 85 NY2d 942 [1995]; see also People v Miles, 119 AD3d 1077, 1078-1079 [2014], lvs denied 24 NY3d 1003 [2014]). As to defendant's weight of the evidence challenge, we find that a different verdict would not have been unreasonable given the circumstantial nature of the evidence implicating defendant as the shooter. However, upon evaluating the evidence in a neutral light, weighing the probative force of the testimony and considering the relative strength of the inferences to be drawn from the proof (see People v Danielson, 9 NY3d at 348-349; People v Bleakley, 69 NY2d 490, 495 [1987]), we cannot say that the jury failed to give the evidence the weight it should be accorded (see People v Alnutt, 107 AD3d 1139, 1143-1144 [2013], lv denied 22 NY3d 1136 [2014]; People v Callicut, 101 AD3d at 1259; People v Brown, 46 AD3d at 951-952; People v Ruiz, 211 AD2d at 830).
We next address defendant's assertion that Supreme Court erred in denying his Batson challenge (see Batson v Kentucky, 476 US 79 [1986]) as to juror No. 13. When determining whether a peremptory challenge has been exercised in a discriminatory manner, a trial court must engage in a now-familiar three-step protocol. "At step one, the moving party bears the [*5]burden of establishing a prima facie case of discrimination in the exercise of peremptory challenges. Once a prima facie case of discrimination has been established, the burden shifts, at step two, to the nonmoving party to offer a facially neutral explanation for each suspect challenge. At the third step, the burden shifts back to the moving party to prove purposeful discrimination and the trial court must determine whether the proffered reasons are pretextual" (People v Hecker, 15 NY3d 625, 634-635 [2010] [internal quotation marks and citations omitted], cert denied 563 US 947 [2011]; see People v Bridgeforth, 28 NY3d 567, 571 [2016]; People v Allen, 86 NY2d 101, 109-110 [1995]).
The first step of this analysis need not detain us, as the issue of whether defendant established a prima facie case became moot when the prosecutor stated his race-neutral reasons for the subject challenge (see People v Hecker, 15 NY3d at 652; People v James, 99 NY2d 264, 270 [2002]; People v Grafton, 132 AD3d 1065, 1067 [2015], lvs denied 26 NY3d 1145, 1147 [2016]). The prosecutor based his peremptory challenge with respect to juror No. 13 on the juror's "attitude" in response to his questions, noting that his "interaction with her was not favorable at all." When questioned further by Supreme Court, the prosecutor explained that his perceptions about the juror's attitude were based upon her tone of voice and mannerisms when speaking to him, which he described as "dismissive" and "rude." The prosecutor also expressed concern with what he deemed to be an abnormal response by juror No. 13 to his inquiry as to why she believed she would be a good juror. The explanation proffered by the prosecutor, which need not be persuasive or plausible but only "facially permissible" (People v Smocum, 99 NY2d 418, 422 [2003]; see Purkett v Elem, 514 US 765, 768 [1995]), was race-neutral and thus satisfied the People's burden under step two (see People v Hernandez, 75 NY2d 350, 356 [1990], affd 500 US 352 [1991]; People v Acevedo, 141 AD3d 843, 846 [2016]; People v Morgan, 24 AD3d 950, 952 [2005], lv denied 6 NY3d 815 [2006]; People v Bodine, 283 AD2d 979, 979-980 [2001], lv denied 96 NY2d 898 [2001]; People v Diaz, 269 AD2d 766, 766 [2000], lv denied 95 NY2d 852 [2000]).
We therefore turn to the third and final step of the Batson inquiry, which "requires the trial court to make an ultimate determination on the issue of discriminatory intent based on all of the facts and circumstances presented" (People v Smocum, 99 NY2d at 422; accord People v Hecker, 15 NY3d at 656). Here, although Supreme Court initially expressed skepticism as to — and, in fact, challenged — the prosecutor's stated reasons, the court made further inquiries of the prosecutor and heard arguments from both sides before ultimately crediting the prosecutor's race-neutral explanation (see People v Showers, 300 AD2d 151, 151 [2002], lv denied 100 NY2d 645 [2003])[FN3]. That determination, which was necessarily based in large part upon Supreme [*6]Court's assessment of the prosecutor's credibility, is entitled to "'great deference' on appeal" (People v Hecker, 15 NY3d at 656, quoting Miller-El v Cockrell, 537 US 322, 339 [2003]; see Batson v Kentucky, 476 US at 98 n 21; People v Hernandez, 75 NY2d at 356; People v Knowles, 79 AD3d 16, 21 [2010], lv denied 16 NY3d 896 [2011]; People v Morgan, 24 AD3d at 952). Moreover, while the sufficiency of defendant's prima facie showing indeed became moot once the prosecutor offered his race-neutral reasons for the peremptory strike at issue, "the strength or paucity of the step one showing is a factor that should be considered in determining whether the record as a whole supports a finding of pretext" (People v Hecker, 15 NY3d at 660; see Snyder v Louisiana, 552 US 472, 478 [2008]). The prima facie showing in this case was very weak, as the prosecutor did not challenge the only two black jurors on the first panel, and the only other black juror on the second panel to that point had been struck for reasons so compelling that even defense counsel agreed removal was appropriate (see People v Hecker, 15 NY3d at 653-655, 660; People v Bolling, 79 NY2d 317, 325 [1992]; People v Henderson, 118 AD3d 1020, 1021 [2014], revd on other grounds 27 NY3d 509 [2016]). Considering "all of the circumstances that bear upon the issue of racial animosity" (Snyder v Louisiana, 552 US at 478; see People v Smocum, 99 NY2d at 422; People v Knowles, 79 AD3d at 23), and mindful that "the best evidence [on that issue] often will be the demeanor of the attorney who exercises the challenge" (Hernandez v New York, 500 US 352, 365 [1991]), we cannot conclude that defendant met "his ultimate burden of showing that the reasons given by the People were pretexts for intentional discrimination" (People v Ardrey, 92 AD3d 967, 970 [2012], lvs denied 19 NY3d 861, 865 [2012]; see People v Smocum, 99 NY2d at 422; People v Payne, 88 NY2d 172, 181 [1996]; People v Allen, 86 NY2d 101, 111 [1995]).
We are similarly unconvinced that defendant was denied his right to a fair trial when Supreme Court refused to allow Bonds to take the stand solely for the purpose of invoking his privilege against self-incrimination in the presence of the jury. Such a determination rests within the sound discretion of the trial court (see People v Thomas, 51 NY2d 466, 472 [1980]), and we discern no abuse of that discretion here. Had Bonds been permitted to take the stand and refuse to answer any questions regarding the incident in question, the jury may well have inferred that Bonds, rather than defendant, was the killer. As Supreme Court correctly noted, such an inference would have been patently unwarranted "since [Bonds'] refusal to testify could have been based upon considerations wholly unrelated to the crimes at issue" (id. at 472; see People v Mejia, 126 AD3d 1364, 1365 [2015], lv denied 26 NY3d 1090 [2015], cert denied ___ US ___, 136 S Ct 2416 [2016]; People v Grimes, 289 AD2d 1072, 1073 [2001], lv denied 97 NY2d 755 [2002]). Nor did the People abuse their discretion in declining to confer immunity upon Bonds (see CPL 50.20 [2] [b]; 50.30; People v Owens, 63 NY2d 824, 825-826 [1984]; People v Shapiro, 50 NY2d 747, 760 [1980]; People v Rivera, 124 AD3d 1070, 1072 [2015], lvs denied 26 NY3d 971 [2015]; People v Smith, 247 AD2d 781, 784 [1998], lv denied 93 NY2d 1027 [1999]).
Finally, we are unpersuaded by defendant's sentencing challenges. Supreme Court lawfully ran the sentence imposed on the murder count consecutively with the sentence imposed on the count of "simple" weapon possession (see Penal Law § 265.03 [3]), as the trial evidence [*7]demonstrated that defendant completed the act of possession within the meaning of that statute before the shooting occurred (see People v Brown, 21 NY3d 739, 750-751 [2013]; People v Durham, 146 AD3d 1070, 1075 [2017], lv denied 29 NY3d 997 [2017]; People v Fabers, 133 AD3d 616, 617 [2015], lv denied 27 NY3d 1150 [2016]; compare People v Harris, 115 AD3d 761, 762-763 [2014], lv denied 23 NY3d 1062 [2014]). Further, given defendant's extensive criminal history, the brutal and senseless nature of his acts and his failure to accept responsibility for them, we perceive neither an abuse of discretion nor extraordinary circumstances that would warrant a reduction of the sentence in the interest of justice (see People v Pratt, 162 AD3d 1202, 1205 [2018], lv denied 32 NY3d 940 [2018]; People v Stanford, 130 AD3d at 1310; People v Green, 121 AD3d 1294, 1297 [2014], lv denied 25 NY3d 1164 [2015).
To the extent not specifically addressed herein, defendant's remaining contentions have been examined and found to be without merit.
Garry, P.J., Rumsey and Pritzker, JJ., concur.




Clark, J. (dissenting).


I cannot join the majority in upholding Supreme Court's denial of defendant's Batson claim regarding the People's use of a peremptory challenge to excuse juror No. 13. Accordingly, I respectfully dissent.
In my view, Supreme Court failed to satisfy its "judicial responsibility" to make an adequate record "reflecting the basis for [it]s ruling[]" (People v Payne, 88 NY2d 172, 184 [1996]; see People v Hecker, 15 NY3d 625, 657 [2010], cert denied 563 US 947 [2011]). In denying defendant's Batson challenge, Supreme Court simply stated, "It's a close call, but I am going to rule in favor of the prosecution. For the reasons set forth on the record." This ambiguous ruling does not expressly determine the factual issue of whether the prosecutor's stated reasons for the peremptory challenge were pretextual or, alternatively, could be believed (see Snyder v Louisiana, 552 US 472, 479 [2008]; People v Morgan, 75 AD3d 1050, 1051-1052 [2010], lv denied 15 NY3d 894 [2010]). The ruling does not illuminate the court's reasons for concluding that "it" was a "close call," highlight the factors that it considered in resolving — if it did in fact resolve — the obvious credibility dispute, or otherwise provide this Court with the ability to engage in a meaningful review of the determination (see People v Hecker, 15 NY3d at 657; People v Payne, 88 NY2d at 183-184). Rather, we are left to infer Supreme Court's reasons for denying defendant's application from the colloquy that took place on the record before the ruling. Up until the ruling, the discussion between Supreme Court and the prosecutor would lead one to believe that the court disagreed with the prosecutor's subjective assessments of juror No. 13 and found the prosecutor's stated reasons to be disingenuous [FN4]. During that colloquy, Supreme Court pressed the prosecutor to be more specific in his reasons for concluding that juror No. 13 had an "attitude," stating that it too had "watched [the juror] very carefully." When the prosecutor described the juror's tone of voice as "dismissive" and "rude," the court stated, "I sat and listened to her myself and I would not define [her tone of voice] as dismissive and rude." The court went on to state that the prosecutor had given "nothing other than . . . conclusions" and [*8]that it did not "see the attitude that [the prosecutor was] suggesting." The court further challenged the prosecutor's dissatisfaction with the juror's answer to his question concerning her possible jury service, stating that it was a "very poor question," and thereafter expressing incredulity at the prosecutor's characterization of her response as abnormal.
At no point did Supreme Court give any indication that it believed any of the race-neutral reasons offered by the prosecutor or that the prosecutor's subjective impressions of juror No. 13 might have some basis in the record. Nor did Supreme Court indicate that its challenges and rebukes of the prosecutor's reasons were intended to test the sincerity of those reasons. To infer such an intention on the part of Supreme Court would, in my view, be to unduly engage in speculation. In the absence of an adequate record setting forth the basis for Supreme Court's ruling, I am unable to engage in an intelligent and meaningful review of the issue (see People v Acevedo, 141 AD3d 843, 852 [2016, McCarthy, J., dissenting]; People v Tucker, 256 AD2d 1019, 1020 [1998]; see generally People v Payne, 88 NY2d at 183-184). As I cannot overlook Supreme Court's failure to make an adequate record, and because I am unwilling to fill in the gaps of the incomplete record with inference or supposition, I respectfully disagree with the majority's determination to uphold Supreme Court's conclusory ruling on defendant's Batson challenge. I would instead hold defendant's appeal in abeyance and remit the matter for further proceedings necessary to satisfy the Batson requirements.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: It is impossible to determine from the minutes whether these acknowledgements were made by three separate grand jurors or whether one of the grand jurors knew multiple witnesses, as there is no grand juror number or other identifying information recorded in the minutes.

Footnote 2: In his pro se supplemental brief, defendant also contends that the People failed to present legally sufficient evidence of his intent to cause the death of the victim. By failing to raise this specific ground in his motion for a trial order of dismissal, defendant has not preserved the issue for our review (see People v Glover, 160 AD3d 1203, 1203-1204 [2018]).

Footnote 3: Contrary to the position taken by the dissent, we need not engage in supposition or speculation to discern the basis for Supreme Court's ruling. To be sure, there can be no question that the court could have provided a more detailed elaboration for its decision to deny the Batson challenge. That said, Supreme Court's ruling that it was finding in favor of the prosecution "[f]or the reasons set forth on the record" could mean only one thing — that it was crediting the prosecutor's stated reasons for the peremptory challenge. Even assuming that this singular conclusion does not necessarily follow from the statements made by Supreme Court in its ruling, we nevertheless find that, "by denying defendant's Batson challenge, the court thereby implicitly determined that the prosecutor's race-neutral explanations for exercising [the] peremptory challenge were not pretextual" (People v Smith, 157 AD3d 978, 981 [2018], lvs denied 31 NY3d 1087 [2018]; see People v Dandridge, 26 AD3d 779, 780 [2006]; People v Beverly, 6 AD3d 874, 876 [2004], lv denied 3 NY3d 637 [2004]). Accordingly, we conclude that Supreme Court satisfied its requirements under Batson and find no reason to remit the matter for further proceedings.

Footnote 4: It is evident from defense counsel's on-the-record expression of shock immediately following Supreme Court's ruling that he had expected and anticipated the opposite ruling.